### No. 26,508.

THE STATE OF KANSAS, on the relation of CHARLES B. GRIFFITH, as Attorney-general of the State of Kansas, *Plaintiff*, v. ROY L. BONE, as Bank Commissioner of the State of Kansas, et al., *Defendants*.

#### SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Depositors' Guaranty Fund—Rights and Remedies of Member Banks.* Each member bank has an interest in the proper administration of the bank depositors' guaranty fund. Any member bank may maintain a proper action to inquire into waste or illegality in the administration of such fund; but an issue of that character is not pertinent in a proceeding for mandamus, and under the declaratory judgment act, for the interpretation of the bank guaranty law as to the rights and liabilities of parties under a present status of such fund.

2. SAME—*Depositors' Guaranty Fund—Nature of Rights and Liabilities of Parties.* The rights and liabilities of parties under the bank guaranty law are statutory rather than contractual, and any controversy arising thereunder is governed by the statute in force at the time the controversy arises.

3. SAME—*Depositors' Guaranty Fund—Liability of Member Banks.* The liability of member banks under the bank guaranty law is limited to their bonds (or money) pledged, and assessments to create or replenish the bank depositors' guaranty fund, provided by the statute.

4. SAME—*Depositors' Guaranty Fund — Liability and Distribution of Bonds Pledged.* The bonds (or money) pledged by a member bank under the guaranty law are pledged as a guarantee that the member bank so pledging such bonds (or money) will pay such assessments as may be necessary to replenish the bank depositors' guaranty fund to enable it to pay the amount due from such fund to holders of certificates thereon which were

State, *ex rel.*, v. Bone.

issued to depositors of failed member banks in liquidation while the bank pledging such bonds (or money) is operating under the bank guaranty law.

5. SAME—*Depositors' Guaranty Fund—Withdrawal of Member Bank—Forfeiture of Pledge—Cessation of Liability.* When a solvent bank operating under the bank guaranty law is put out from under the operation of the law by the bank commissioner, proceeding under the first paragraph of R.S. 9-205, its bonds (or money) pledged are forfeited to the bank depositors' guaranty fund; its deposits cease to be guaranteed, and it is not liable to the bank depositors' guaranty fund for assessments made after the date its deposits cease to be guaranteed.

6. SAME—*Depositors' Guaranty Fund—Voluntary Withdrawal—Disposition of Pledge.* When a solvent member bank operating under the bank guaranty law voluntarily withdraws therefrom, proceeding under the second paragraph of R.S. 9-205, its bonds (or money) pledged may be sold, or so much of them as may be necessary, to pay assessments made to replenish the bank depositors' guaranty fund to the extent that there may be paid from such fund the amount which may be due therefrom on certificates thereon which were issued to depositors of the failed member bank in liquidation at the time such withdrawing bank's deposits ceased to be guaranteed. If all such withdrawing bank's bonds (or money) pledged are not necessary for that purpose the remainder should be returned to such bank.

7. SAME—*Depositors' Guaranty Fund—Insolvency of Member Bank—Disposition of Pledge.* When a solvent member bank voluntarily liquidates its affairs and ceases to do business as a state bank, and thereby ceases to operate under the bank depositors' guaranty law, proceeding under R.S. 9-209, its bonds (or money) pledged may be sold, or so much of them as may be necessary, to pay assessments made to replenish the bank depositors' guaranty fund to the extent that there may be paid from such fund the amount which may be due therefrom on certificates thereon which were issued to depositors of failed member banks in liquidation at the time such withdrawing bank's deposits ceased to be guaranteed. If all such withdrawing bank's bonds (or money) pledged are not necessary for that purpose, the remainder should be returned to such bank.

8. SAME—*Depositors' Guaranty Fund—Procedure for Sale of Bonds Pledged.* The procedure outlined in the first paragraph of R.S. 9-205 is not well adapted to the sale of the bonds (or money) pledged, or such portion thereof as may be necessary, of a solvent member bank which has voluntarily withdrawn, proceeding under the last paragraph of R. S. 9-205, nor of a solvent member bank which has liquidated its affairs, proceeding under R. S. 9-209. Such sale should be made as of any property pledged for a specific purpose.

9. SAME—*Depositors' Guaranty Fund—Disposition of Money Pledged in Lieu of Bonds.* When money has been pledged in lieu of bonds, the amount of the assessments may be charged against, or drawn directly from, the money pledged.

Original proceeding in mandamus. Opinion filed April 10, 1926. Judgment for plaintiff.

*Charles B. Griffith,* attorney-general, *John G. Egan,* assistant attorney-general, *William A. Smith,* assistant attorney-general, and *Randal C. Harvey,* of Topeka, for the plaintiff.

*Bennett R. Wheeler, S. M. Brewster* and *John L. Hunt,* all of Topeka, for defendants the Osage County Bank, the Topeka State Bank and the State Exchange Bank of Mankato.

*R. R. Vermillion, Earle W. Evans, Joseph G. Carey* and *W. F. Lilleston,* all of Wichita, for defendants the State Savings and Mercantile Bank, the Southwest State Bank, the Peoples State Bank of Medicine Lodge, the Fidelity State Bank, and the Onaga State Bank.

*Kos Harris, V. Harris* and *M. P. Shearer,* all of Wichita, for defendant the Wichita State Bank.

*Clad Hamilton* and *Donald A. Campbell,* both of Topeka, for defendants the Fort Scott State Bank and the State Bank of Douglass.

*Robert Stone, George T. McDermott, Robert L. Webb* and *Beryl R. Johnson,* all of Topeka, for the Kansas State Bankers' Association, as *amici curiæ.*

The opinion of the court was delivered by

HARVEY, J.: This is a proceeding in mandamus to compel the bank commissioner to sell bonds pledged as evidence of good faith by certain member banks under the bank guaranty law for the payment of certain unpaid assessments levied by the bank commissioner against such banks, and, under the declaratory judgment act, for the interpretation of the provisions of the bank guaranty law as to the liability of banks once members of the guaranty fund, but which had voluntarily withdrawn therefrom, or had liquidated their affairs and ceased to do a banking business. The seventeen banks whose bonds, or money deposited in lieu thereof, are sought to be sold in this action, were made parties defendant and have filed returns and answers. The question now arises upon a motion by the plaintiff to strike out portions of the answers of the defendants, and upon a motion of plaintiff for judgment upon the pleadings, notwithstanding the answers and returns.

The legislature in 1909 (Laws 1909, ch. 61) enacted what is commonly known as the bank guaranty law. Its general design was to provide a fund arising from assessments upon banks, out of which should be paid to depositors in any failed member bank the amount of their deposits not paid by its assets. Membership in the scheme was voluntary and was accomplished only upon application to the

bank commissioner, accompanied by a resolution of the board of directors of the bank, authorized by the stockholders, and an acceptance of such application by the bank commissioner after a thorough examination of the bank. Two funds were provided: One a deposit of bonds, or money in lieu of bonds, by a member bank, which was a pledge as an evidence of good faith that it would, on its part, carry out the provisions of the act. This fund remained the property of the bank pledging it, and was carried as a part of its assets until such time as might be necessary otherwise to use it. The other fund provided was designated the bank depositors' guaranty fund. It consisted of an initial payment by the member bank of one-twentieth of one per cent of its average deposits eligible to guaranty, as shown by its last four published statements, and of subsequent payments, made upon assessment by the bank commissioner, of one-twentieth of one per cent of its average guaranteed deposits, of which assessments there was a regular one in January of each year, and might be as many as five each calendar year; and this is the fund out of which deposits in a failed bank were paid.

The law provided that when a bank which was a member of the scheme failed, the bank commissioner should take charge and proceed to liquidate the bank by one of his deputies, or a receiver appointed by him. On taking charge he at once issued to depositors entitled thereto certificates upon the bank depositors' guaranty fund for the amount of their respective deposits, which certificates bore interest at the rate of six per cent per annum. No payments were made to the holders of these certificates from the bank depositors' guaranty fund until the bank was finally liquidated, which ordinarily takes about two years. Each failed bank had creditors, other than depositors, who were not entitled to certificates on the guaranty fund, and in some instances certain creditors had preferred claims. The assets of the failed bank, as they were liquidated, after the paying of the expense of the liquidation, were distributed, first, to the payment of preferred claims; and second, to the payment, *pro rata,* of all creditors of the bank. The amount of such payments, made to depositors to whom certificates on the bank depositors' guaranty fund had been issued, were credited upon such certificates, and the balance was then due and payable by the bank commissioner from the bank depositors' guaranty fund. If such fund was insufficient, or became depleted below a sum named, the bank commissioner then levied one or more assessments, not exceeding five

in any calendar year, upon the member banks to replenish such fund.

Passing upon plaintiff's motion to strike, the answers of several of the defendants contain general allegations, in substance that the administration of the guaranty fund and the liquidation of failed member banks by the bank commissioner, or under his direction, had been inefficient, wasteful, and in some instances illegal, in that the liquidation of the failed member banks has been much more expensive than necessary; that the assets of such banks have been dissipated, sold for less than their value, and that certificates on the guaranty fund have been issued to persons not depositors as defined by the statute, and not entitled thereto; with the result, (1) that the assets of failed member banks have not paid as large a percentage upon the certificates on the bank depositors' guaranty fund given to depositors of such banks as they should have paid; and (2) that there is a greater number and amount of certificates against the bank depositors' guaranty fund than there should be; and it is averred that had the liquidation of failed member banks been properly handled, the expenses of such liquidation kept down, and the assets properly collected and disbursed, and had certificates on the guaranty fund been issued only to depositors rightfully entitled thereto, the assessments upon member banks provided by law for the purpose of the bank depositors' guaranty fund would have been ample for that purpose, and there would have been no necessity of selling the bonds pledged of member banks. Since, under the plan outlined by statute, the bank depositors' guaranty fund is liable only on certificates drawn thereon in favor of depositors lawfully entitled thereto, and only for the difference between the face of such certificates, with interest, as provided by statute, and the amount credited thereon from the assets of the failed member bank, it necessarily follows that a member bank has such an interest in the bank depositors' guaranty fund that it may, in a proper case, inquire as to whether or not the liquidation of failed member banks has been conducted with waste, and whether certificates have been issued other than to depositors lawfully entitled thereto. Passing upon a similar question, under the bank guaranty law of Nebraska, the supreme court of that state, in *State v. Farmers State Bank*, 103 Neb. 194, said:

"Each of such banks has an interest in the proper administration and distribution of the fund. If it appears that, by reason of an error or mistake of

State, *ex rel.*, v. Bone.

law on the part of a public officer, the depositors' guaranty fund is about to be depleted, any such bank may intervene to protect itself and all other banks contributing to the fund."

But we do not regard an inquiry of that character appropriate in this proceeding. The allegations of the answers upon these matters are general in their terms rather than specific, and we do not regard it proper in this cause, upon such general allegations, to institute and conduct a minute inquiry into the manner in which each failed member bank has been liquidated, nor to undertake a detailed examination of each certificate heretofore issued by the bank commissioner on the bank depositors' guaranty fund to ascertain whether or not the person to whom such certificate was issued was a depositor within the meaning of the law and lawfully entitled thereto. Such an inquiry is foreign to the real purpose of this proceeding, which seeks an interpretation of the statute as bearing upon the legal rights and liabilities of the parties. Hence the motion to strike will be sustained, but this ruling will not preclude any member bank, or group of member banks, from maintaining a proper action to investigate and have determined the matters here referred to.

The statute provided several methods by which a bank which had once become a member of the scheme might cease to be a member bank, either by action voluntary on its part, or by action of the bank commissioner for cause. Some of these statutory provisions have been amended from time to time. The specific provisions of the statute necessary to be considered in this connection, with the amendments thereto, are as follows:

"Sec. 5. A penalty of fifty per cent of the amount of said assessment shall be added to the assessment of any bank not remitting as aforesaid within thirty days after receipt of notice of such assessment from the bank commissioner, and if any bank, which shall have been assessed and notified as aforesaid, shall fail to remit the amount of said assessment as herein provided, a sufficient amount of its bonds (together with the unexpired coupons) shall be immediately sold by the bank commissioner at public sale and the proceeds used to pay said assessment. Any balance remaining from the proceeds of such sale after the payment of such assessment shall remain to the credit of the bank in the depositors' guaranty fund. The said balance, together with the remainder of the bonds (or cash in lieu thereof), shall be forfeited to the bank depositors' guaranty fund if the bank does not, within sixty days from default in payment of such assessment, remit the full amount of such assessments and penalty to date, and restore the amount of its bonds, or money pledged, as evidence of good faith. Upon the bank's failure to remit its assessments according to the terms of this act, the bank commissioner shall im-

40—120 Kan.

mediately examine such bank, and if it is found in his judgment to be insolvent, he shall take charge of and liquidate said bank according to law. If said bank be found solvent, the bank commissioner shall cancel its certificate as a guaranteed bank, and cause to be displayed in its banking rooms, in a conspicuous place, continuously for six months, a card not smaller than twenty inches by thirty inches, and in large, plain type, reading as follows: 'This bank has withdrawn from the bank depositors' guaranty fund and the guaranty of its deposits will cease on and after ———.' The date on this card shall be a date six months after the first posting of such card.

"Any bank electing to withdraw from the bank depositors' guaranty fund may do so by giving notice to the bank commissioner and displaying a card as aforesaid, and at the expiration of the six months as aforesaid may receive its bonds (provided always that said bank shall have paid assessments in full to date) when the affairs of all failed banks in liquidation at the expiration of said six months shall have been closed up and the bank shall have paid its assessments on account of same." (Laws 1909, ch. 61, § 5; R. S. 9-205.)

"SEC. 9. A solvent *guaranteed* bank, upon retiring from business and liquidating its affairs, shall be entitled to receive back from the state treasurer [after all the depositors in such bank have been paid in full] its bonds or money pledged, *after all depositors in such bank and all assessments on account of the guaranteed banks in liquidation have been paid in full,* but not any part of any unused assessments that may be in the bank depositors' guaranty fund; [*provided, however,* that should such bank be turning over its business to another bank, it shall not receive back its bonds, or money deposited in lieu thereof, until the bank receiving its business shall have deposited with the state treasurer bonds, or money in lieu thereof, according to the requirements of this act.]" (Laws 1909, ch. 61, § 9, as amended by Laws 1911, ch. 61, § 3; R. S. 9-209.)

"SEC. 11. If at any regular or special examination of a guaranteed bank it shall be found to be violating *or failing to comply with* any [of the] provisions of this act, the bank commissioner shall notify the bank and *require it within* [the bank may be given] thirty days [in which] to comply with *such provisions;* [the provisions of this act] and if at the expiration of *such* [this] time *compliance has not been had,* [such provisions have not been complied with], the bank commissioner shall cancel its certificate of membership in the bank depositors' guaranty fund as herein provided, and forfeit *to said guaranty fund* its bonds deposited with the state treasurer for the benefit *thereof* [of the bank depositors' guaranty fund.] *Such cancellation of membership and forfeiture of bonds shall not relieve such bank from the payment of assessments levied on account of banks that failed; nor that were in charge of the bank commissioner prior to the cancellation of such membership."* (Laws 1909, ch. 61, § 11, as amended by Laws 1923, ch. 72, § 3; R. S. 9-211.)

For brevity we shall hereafter refer to these as sections 5, 9 and 11. Section 5 has not been amended; sections 9 and 11 have been. As here printed, they were originally enacted including the words in brackets, but omitting the words in italics. As amended, the words in brackets were omitted and the words in italics were used.

This enumeration does not include situations by which, apparently, a member bank became deprived of the right to be permitted to participate in the benefits of the act. (Laws 1909, ch. 61, § 7; R. S. 9-207; Laws 1909, ch. 61, § 14, repealed by Laws 1917, ch. 77, § 1.) No questions in this case arise under these sections, hence we need not further consider them here.

The questions in this case relate to the liability of member banks for assessments to replenish the bank depositors' guaranty fund depleted by payments to holders of certificates on that fund issued to depositors of banks in liquidation at the time the member bank elected to withdraw from the fund, as provided in the latter part of section 5, or had liquidated its affairs, as provided in section 9, or had failed to pay its assessment and had been put out under the first part of section 5, and the rights of such banks to have their bonds pledged, or money in lieu thereof, returned to them.

It is contended on behalf of the plaintiff that when a bank once becomes a member bank, and other member banks have failed, by reason of which certificates on the bank depositors' guaranty fund have been issued by the bank commissioner to depositors, all of the banks members of the guaranty fund at the time such bank failed are liable for whatever assessments may be necessary to replenish the bank depositors' guaranty fund under the assessments provided in the statute until all of such certificates are paid in full, even though the bank has ceased to be a member bank and the amount required is in excess of the value of its bonds pledged, or money deposited in lieu thereof. In other words, it is the contention of plaintiff that certificates issued on the bank depositors' guaranty fund must, at all events, be paid in full, and that there is no limitation upon the liability of member banks, even though they cease to be member banks, for the payment of assessments made as the statutes provide, until such certificates on the bank depositors' guaranty fund have been paid in full. With this contention we cannot agree. There is nothing in the bank guaranty act which creates what we usually term a personal liability on member banks. Their liability is limited, first by the number of assessments that may be made in any calendar year, and the rate of such assessment, and the sum upon which it shall be computed; and, second, by the bonds pledged, or money deposited in lieu thereof, as evidence of good faith that they will, on their part, carry out the provisions of the act. If anything were needed other than an ex-

amination of the provisions of the act as a whole to fortify that view, it may be noted that when the statute was enacted the first draft of it included a provision which, in effect, made member banks personally liable. This was eliminated by the legislature, indicating that the legislature purposely refrained from making a personal liability. No doubt it was thought at the time the act was passed that the provisions made would be sufficient under any circumstances to pay in full certificates drawn on the bank depositors' guaranty fund, but limitations of liability of member banks were clearly placed in the act, no doubt for the purpose that, should there be such a period of financial depression or other causes as to cause failure of many member banks within a short space of time, such failures would not carry down and render insolvent all of the otherwise solvent, conservatively managed member banks.

It may be observed that the sections of the statute quoted, generally speaking, provide two circumstances in which a member bank may voluntarily get out from under the provisions of the guaranty act: (1) When it voluntarily withdraws from the scheme, but continues in the banking business, in the manner provided by the latter portion of section 5; and (2) when it voluntarily liquidates its affairs and goes out of the banking business, as provided in section 9. The statute also provides two general conditions under which a bank shall be put out from under the provisions of the law: (1) When it refuses to pay its assessment, a penalty of fifty per cent is added and enough of its bonds pledged sold to pay such assessment, and if it continues to refuse to pay, all of its bonds are forfeited to the bank depositors' guaranty fund; the bank is then to be examined, and if found insolvent, to be liquidated, but if found solvent it is to be put out of the scheme as a member bank; and (2) under section 11, when, at any regular or special examination of the bank it is found to be violating the provisions of the bank guaranty act, its bonds are to be forfeited to the bank depositors' guaranty fund and it is to be put out of the scheme as a member bank.

Referring now to the forced putting out of the scheme and the voluntary withdrawal, under section 5, this difference is noted: When the bank is forced out of the scheme and is still a solvent, going bank, its bonds pledged are forfeited to the bank depositors' guaranty fund and it has no further liability under the act, and this is true without regard to the condition of the bank depositors' guar-

anty fund or its then tentative liability because of certificates which have been issued to depositors of failed member banks. Its bonds pledged are forfeited even if there are no such certificates then outstanding. As to the bank voluntarily withdrawing under that act, its bonds pledged should be returned to the withdrawing bank unless at that time there are certificates on the guaranty fund which have been issued to depositors of failed member banks then in process of liquidation. If such certificates are outstanding and it is necessary to make future assessments to replenish the depositors' guaranty fund so that such certificates may be paid, the bonds (or money) pledged of the withdrawing bank can be converted into the bank depositors' guaranty fund only to the extent that they may be necessary to pay assessments later made to replenish the bank depositors' guaranty fund to enable it to pay the certificates drawn on that fund in favor of depositors of failed member banks then in liquidation. If all of its bonds pledged are not needed for that purpose, the residue should be delivered to the withdrawing bank. These bonds (or money) were pledged for that purpose, and, like any property pledged for a specific purpose, may be sold to the amount necessary to make good the purpose of the pledge.

Turning now to the more specific questions before us. The defendant, the Osage County Bank, became a member bank August 11, 1909, and pledged bonds of the value of $2,000 as its evidence of good faith. On February 13, 1924, acting under the latter part of section 5 of the act, it elected to withdraw and displayed the card fixing the date of August 27, 1924, when its deposits would cease to be guaranteed. During the time it was a member bank it paid all of the assessments made upon it for the benefit of the bank depositors' guaranty fund. At the time it ceased to be a member there were in the hands of depositors of failed member banks certificates on the bank depositors' guaranty fund, less dividends already paid on same from the assets of such failed member banks, in the sum of $4,388,225. The bank depositors' guaranty fund was depleted by the payments on certificates so previously issued, and on November 10, 1924, the bank commissioner made an assessment upon all member banks, including the Osage County Bank, of one-twentieth of one per cent upon their average guaranteed deposits, amounting to $168.33 on the Osage County Bank. A similar assessment was made on November 24, 1924. Neither of these assessments was paid by the Osage County Bank. In this proceeding the plaintiff seeks to

require the bank commissioner to declare forfeited and to sell the $2,000 worth of bonds belonging to the Osage County Bank, and from the proceeds to pay these assessments. The defendant, the Osage County Bank, argues that after it withdrew from the fund it had no guaranteed deposits, and since assessments are made on average guaranteed deposits (R. S. 9-203), no assessment could be made upon it. But that is rather begging the question. It did have guaranteed deposits at the time certificates were issued on the bank depositors' guaranty fund to depositors of failed member banks which were in liquidation at the time the withdrawal of this bank became effective. While the language of the statute is not as clear as it should be, we think there can be no mistake of its meaning, and it should be construed to mean, when applied to a bank which has withdrawn and assessments are necessary after its deposits cease to be guaranteed, that such assessment should be made upon its average guaranteed deposits as shown by its last four published statements to the bank commissioner when it did have guaranteed deposits, and this is the basis upon which such assessments were made.

This defendant contends that the proceeding outlined in the first part of section 5 is not appropriate for the sale of its bonds, and this contention is correct. It is not contemplated by the statute that the bonds of a bank which voluntarily withdrew should be forfeited *in toto* for the nonpayment of an assessment, and that the bank should then, if found to be solvent, be put out from under the operation of the law by the bank commissioner. It is out from under the law by its own act, and its bonds pledged are liable only to the extent necessary to pay assessments to the bank depositors' guaranty fund, because of the depletion of such fund, and to pay certificates issued to depositors of failed member banks in liquidation at the time it withdrew. The bonds should be sold as any other property pledged for a specific purpose, and only so much of them as is necessary to pay the assessments made. If, because of the denomination of the bonds, it is not possible to sell exactly enough to pay the two assessments of $168.33 each, enough should be sold to pay such assessments, and any surplus should remain with the pledged fund until necessary, if it should become necessary, to pay other assessments to replenish the bank depositors' guaranty fund because of the payment of certificates to depositors of failed member banks in liquidation at the time this bank withdrew from the operation of the law. What is said with reference to the Osage County Bank applies also

to the defendants the Topeka State Bank, the Citizens State Bank of Seneca, the State Exchange Bank of Mankato, the Smith County State Bank, the State Bank of Bluff City, the Farmers State Bank of Hazelton, the Onaga State Bank, and the State Bank of Douglass, except so far as the amount of their bonds or assessment made against such banks and the condition of the bank depositors' guaranty fund with reference to outstanding certificates thereon issued to depositors of failed member banks in liquidation at the time each of such banks withdrew from the operation of the law, may be concerned. These details the parties should have no controversy over.

The situation of the defendant, the Wichita State Bank, is a little different. Plaintiff alleges that it voluntarily withdrew from the fund, and other facts placing it substantially in the same class as the Osage County Bank, but this defendant denies that it withdrew from the fund, and alleges that it was put out from under the operation of the law by action of the bank commissioner in accordance with the provisions of the first part of section 5. So far as the relief sought in this case is concerned, we do not regard it material which way the bank went out from under the operation of the law, for it is alleged and admitted that since that time assessments to replenish the bank depositors' guaranty fund to enable it to pay certificates drawn thereon to depositors of failed member banks then in liquidation is more than sufficient to consume the bonds it had deposited with the state treasurer. Hence, as to this bank, the order will be that all of its bonds pledged as an evidence of good faith be sold and the proceeds applied upon the assessments shown by the pleadings to have been made against this bank, and the bank be thereby relieved from further liability under the law. The plaintiff alleges that the bonds pledged of this bank are not sufficient to pay its proper share of the sum necessary to replenish the bank depositors' guaranty fund by reason of certificates issued thereon to depositors of failed member banks in liquidation at the time this bank withdrew, or was put out of operation under the act, and that the bank should be held liable for the balance of such assessments now made, and which may be necessary to be made, in order to pay such certificate holders in full. With this contention we cannot agree. There is no personal liability upon the bank. Its liability was limited by assessments made while it was a member and by its bonds which it pledged as an evidence of good faith, and when that lia-

bility is exhausted and the bank is no longer operating under the provisions of the act, it is not further liable.

The State Saving and Mercantile Bank of Wichita became a member bank August 20, 1909, and pledged bonds of the value of $7,500 as its evidence of good faith. On June 12, 1922, it liquidated its affairs by paying its depositors and creditors in full and surrendered its authority to do a banking business. It did not turn its business over to any other bank. On that date there were outstanding certificates on the bank depositors' guaranty fund which had been issued to depositors of failed member banks then in liquidation, less dividends then paid from the assets of such bank, in the sum of $1,151,539.56. Regular and special assessments were made by the bank commissioner upon the average guaranteed deposits of member banks November 29, 1922; January 15, 1923; January 15, 1924; November 10 and November 25, 1924, which on this bank amounted to $719.93 each, amounting to $3,599.65, to reimburse the bank depositors' guaranty fund to enable it to pay the balance due upon such certificates. By this action plaintiff seeks to require the present bank commissioner to declare forfeited and sell the bonds pledged of this bank and apply the proceeds to the payment of such assessments. This defendant contends that it is entitled to have its bonds returned to it under the provisions of R. S. 9-209, as that section of the law now stands, and in support of that contention cites the case of *Mississippi Banking Department et al. v. Adams,* 137 Miss. 127, where the court had before it for construction section 40 of the bank guaranty law of Mississippi, which is identical with our present statute, R. S. 9-209. It was there said:

"This section is perfectly plain and unambiguous, and practically construes itself. It says that a guaranteed bank upon retiring from business shall be entitled to receive from the state treasurer its bonds after all its depositors have been paid in full, and after it has paid all *assessments* on account of the guaranteed banks in liquidation. It has to pay nothing more than the *assessments* that *have been* made against it under this banking law. *It is not liable for any fund* under this act *until* an assessment has been made against it."

It may be conceded that this section is open to the interpretation given it by the supreme court of Mississippi when interpreted as a part of the original bank guaranty law of that state without the same having been amended. But in view of the amendment made to section 9 of the original act in this state, that construction is not tenable. Section 9 of the original act provided, in substance, that a

bank which was going out of the banking business, not turning its business over to any other bank not operating under the fund, whether state or national, but quitting the banking business completely, should have returned to it its bonds or money pledged. When that statute was amended in 1911 the condition with reference to whether it was turning its business over to another bank was omitted. Now if that is the only change the legislature meant to make in this section it would have stopped just before the word "provided" in the original section. It did not do that, but inserted language which, in effect, placed a bank liquidating its affairs and going out of business as a state bank upon the same footing with reference to its bonds pledged and its liability to the bank depositors' guaranty fund that a bank which voluntarily withdrew (under latter part of section 5) from the operation of the bank guaranty law and continued in business has always been under; that is, it provided that such a bank retiring from business may have its bonds returned to it when it has paid in full all of its creditors and all of its assessments to the guaranty fund, and "all assessments on account of the guaranteed banks in liquidation." It seems impossible to study the original section 9 of the act and the amendment of 1911 thereto without reaching the conclusion we have just stated. But this defendant contends that if this construction is to be given to the amended act, then such amended act is in violation of article 1, section 10, of the constitution of the United States, for the reason that it impairs the obligation of contract. Defendant's argument in this respect is that when it voluntarily made application and was admitted to do business as a member bank, the statute, as it then existed, permitted it to withdraw its bonds at any time thereafter, if it should liquidate its affairs, pay its creditors in full, surrender its authority to do business as a bank, and not turn its business over to some bank not operating under the guaranty law, and that this provision of the law constituted an essential element of the agreement by which the bank agreed to be bound by the law, and that to change such a material provision of its contract without its consent is to impair the obligation of contract, within the meaning of the constitutional provision above mentioned. This contention cannot be sustained.

The act of 1911 (Laws 1911, ch. 61), which amended section 9 of the original bank guaranty law, also amended other material

provisions thereof. It amended the section with reference to the character of deposits protected by the provisions of the act. The earlier statute provided for the protection only of deposits which did not bear interest, certain time certificates bearing not more than three per cent interest, and certain savings accounts not exceeding $100 to any one person. The act of 1911 changed this and made deposits protected that were not otherwise secured. This had the effect of greatly enlarging the number and amount of deposits guaranteed under the provisions of the act. Assessments were, under the law, made upon the average guaranteed deposit, and were, after the 1911 act became effective, computed upon the amount of the deposits as guaranteed under that statute, rather than the more limited deposit guaranteed under the earlier act. Since this defendant paid these assessments up till the time it liquidated, and had its deposits guaranteed under the act of 1911 instead of under the original act of 1909, and since it made no effort to withdraw from the provisions of the act because of any amendment made therein by the act of 1911, it cannot now be heard to say that it did not consent to such amendments as were made at that time, and other amendments not complained of by it which have been made in the law from time to time.

The statute is hardly contractual in its nature, anyway. It was originally enacted, and the successive changes from time to time have been made in it, under and by virtue of the police power of the state. (*Noble State Bank v. Haskell,* 219 U. S. 104; *Assaria State Bank v. Dolley,* 219 U. S. 121; *Spokane & Eastern T. Co. v. Hart,* 127 Wash. 541; *Wirtz v. Nestos,* 200 N. W. 524 [N. D.].) The obligations are imposed as statutory obligations rather than contractual obligations. Even certificates issued by the bank commissioner to depositors on the bank depositors' guaranty fund are not negotiable instruments in the sense that term is used in the negotiable instruments act, but simply evidence statutory rights and obligations. (*State v. Home State Bank of Dunning,* 201 N. W. 971 [Neb.]; *State, ex rel. Davis, v. Kilgore State Bank,* 112 Neb. 856; *Kidder v. Hall,* 113 Tex. 49.)

Had plaintiff immediately on the passage of this act of 1911 liquidated its affairs, paid its creditors and any assessments previously made from the guaranty fund, surrendered its certificate of authority to do business as a bank without turning its business over to a bank

State, *ex rel.*, v. Bone.

which was not operating under the guaranty act, perhaps it would have been entitled to its bonds, but we are not called upon to determine that question, for it is not presented. This defendant, having had its increased class of deposits guaranteed under the amending statutes of 1911, and having paid assessments based upon such increased class of deposits for more than ten years, is not in good position now to say it is not bound by the amending statute. (*First State Bank v. Smith*, 207 N. W. 467 [S. D.].) Membership of defendant in this scheme was at all times voluntary; it went into the scheme voluntarily; it could have withdrawn any time it chose to do so; it voluntarily remained a member bank; hence it necessarily consented and agreed, not only to the terms of the original act, but to the several changes made thereto by amendment from time to time. The rights and liabilities of the parties are statutory rights and liabilities, rather than contract rights and liabilities. This applies to the rights and liabilities, not only of member banks, but of depositors and holders of certificates on the bank depositors' guaranty fund. And their rights and liabilities should be determined under the statute as it exists at the time the question in controversy arises. (See *State, ex rel. Davis, v. Peoples State Bank*, 111 Neb. 126; *First Nat. Bank v. Hirning*, 204 N. W. 901 [S. D.]; *Chapman v. Guaranty State Bank*, 267 S. W. 690 [Tex.]; and cases heretofore cited.)

It is argued that a member bank pays assessments to the bank depositors' guaranty fund, not to depositors of failed member banks. This is correct. But, under the statute no payments are made from the bank depositors' guaranty fund to holders of certificates drawn thereon in favor of depositors of a failed member bank until such bank has been liquidated, which, experience has shown, averages about two years. Hence, when there is a failed member bank in process of liquidation, to the depositors of which certificates have been issued on the bank depositors' guaranty fund, there is a contingent liability upon that fund. It is argued that when a bank voluntarily liquidates and ceases to do a banking business it no longer has deposits protected by the guaranty law and there is no consideration for its future liability to the bank depositors' guaranty fund, and *Citizens' Nat. Bank of Broken Arrow v. State*, 76 Okla. 94, is cited. Without examining it carefully, we assume that decision correctly interpreted the Oklahoma statute, but it is not controlling

here, for the reason that the rights and liabilities of the parties are controlled by our statute, and a fair consideration of the statute leads to the definite conclusion that a member bank, to the extent of its bonds pledged, is liable for assessments made to replenish the bank depositors' guaranty fund to the extent such assessments are necessary to pay certificates drawn on that fund in favor of depositors of failed member banks in process of liquidation at the time a member bank voluntarily liquidates and ceases to do a banking business.

· What is said concerning the State Savings and Mercantile Bank applies to the defendants the Southwest State Bank of Wichita, the Fort Scott State Bank, the Peoples State Bank of Medicine Lodge, the Farmers State and Savings Bank of Lawrence, and the Fidelity State Bank of Wichita, except as to the amount of bonds pledged, the assessments made, and conditions at the times they respectively liquidated. As to each of them, the defendant bank commissioner should sell sufficient of the bonds pledged to pay assessments made on account of banks in liquidation at the time they respectively liquidated and ceased to do business. The Seneca State and Savings Bank is in the same situation except that it pledged money in lieu of bonds. There can be no purpose in selling money, hence the bank commissioner should charge the assessments made on this bank to its money pledged.

Judgment will be entered for plaintiff in accordance with this opinion. Since the real purpose of this proceeding is to have the statutes interpreted, a writ will not issue at this time.