No. 36,041

The State of Kansas, ex rel. Bernard Peterson, County Attorney of Harvey County (Max Regier, County Attorney of Harvey County, substituted), *Plaintiff,* v. The Kansas State Board of Agriculture et al., *Defendants.*

(149 P. 2d 604)

Opinion filed June 10, 1944.

*Bernard Peterson, Max Regier* and *J. G. Somers,* all of Newton, were on the briefs for the plaintiff.

*Warden L. Noe,* special assistant attorney general, and *Vincent Hiebsch,* of Wichita, argued the cause, and *A. B. Mitchell,* attorney general, *Eldon Wallingford,* assistant attorney general, and *K. W. Pringle,* of Wichita, were on the briefs for the defendants.

The opinion of the court was delivered by .

Harvey, J.: This is an original action in quo warranto brought by the state on the relation of the county attorney of Harvey county. The defendants are the State Board of Agriculture, the Division of Water Resources within that board, and its chief engineer. The purpose of the action is to inquire into the authority of defendants to regulate the taking of subterranean waters for beneficial uses and to allot the same among such users. The facts are not controverted and the action is presented to this court upon plaintiff's motion for judgment on the pleadings.

The pertinent facts as shown by the record may be summarized as follows: In Harvey and McPherson (and perhaps other) counties is a geological formation known as the Equus Beds. (See University Geological Survey of Kansas, Vol. II, pp. 287 to 296, for more detailed description.) This is alleged to cover an area about thirty miles east and west and seventy miles long. The Equus Beds are filled with water of excellent quality for domestic purposes.

The city of Newton, situated about seven miles east of these beds, since 1899 has obtained its entire water supply for the use of the inhabitants of the city from the Equus Beds. The cities of Burrton and Halstead, situated within the Equus Beds, also obtain their water supply therefrom. About May, 1940, the city of Wichita leased land within the Equus Beds and put down as many as twenty-five wells, from which water is pumped and conveyed by pipes more than twenty miles to the city of Wichita and there used to supply water to the inhabitants of the city. This work was practically completed by September 1, 1940, at a cost of approximately $2,500,-000. On March 31, 1943, the city of Wichita made an application in writing to the chief engineer of the Division of Water Resources of the State Board of Agriculture for a permit approving the appropriation and application to beneficial use by the inhabitants of the city of Wichita and its environs, including defense and industrial plants, of water from the Equus Beds to the extent of not less than thirty-five cubic feet per second to a maximum of fifty cubic feet per second; stating the appropriation had commenced September 1, 1940, and that this was the only adequate supply of wholesome water available, and prayed that the application be set for hearing and granted. Notice of the filing of the application was published in the Newton newspapers advising persons interested, who desired to do so, to file protests with the chief engineer of the Division of Water Resources within thirty days after the first publication of the notice. Written protests were filed by the cities of Newton, Halstead and Burrton. The application and protests were set for hearing on September 13, 1943. Due notice was given to the cities of Wichita, Newton, Burrton and Halstead, also to the cities of McPherson, Moundridge, Hesston, Sedgwick, Valley Center, Galva, Canton and Inman, all within or near the Equus Beds. Since the protests filed raised the question of the authority of defendants to pass upon the application, the hearing was continued pending the bringing and determination of this action.

None of the users of water from the Equus Beds had made application to defendants for a permit to use the same, and at the present time there is ample for the needs of all of them. Therefore, the purpose of the action appears to be to determine the authority of defendants to control the use of the water in the Equus Beds, and particularly their authority to allot it among various claimants.

On behalf of plaintiff it is contended that there is no authority for defendants to regulate the use of the water in question among the cities or others now using it, or to allot such water, with certain quantities to one or another, and perhaps to deny to some the right to use it at all. On behalf of defendants it is contended that this authority is found in our statutes, and particularly in G. S. 1935, 24-901 to 24-905.

These contentions make it advisable to examine our statutes and decisions, so far as pertinent here, relating to water and its users.

From the beginning of our history as a state (Territorial Laws 1855, ch. 96, Laws 1862, ch. 135, G. S. 1935, 77-109) the common law of England has been the basis of the law of this state, and except as modified by constitutional or statutory provisions, by judicial decisions, or by the wants and needs of the people, it has continued to remain the law of this state. Our decisions over the years have held the common law to be applicable to water and the rights of parties thereto except and to the extent it has been modified by statutes, judicial opinions, or the wants and needs of the people. In *Shamleffer v. Peerless Mill Co.*, 18 Kan. 24 (1877) it was held:

"Every man through whose land a stream of water runs is entitled to the flow of that stream without diminution or alteration."

The decision was based upon the common law and it was said:

"This right he has as an incident to the property in his land, and he cannot be deprived of it but by grant, actual or presumptive. . . . [It] is not what is called an easement, because it is inseparably connected with, and inherent in, the property in the land; it is a parcel of the inheritance, and passes with it." (pp. 32, 33.)

In *City of Emporia v. Soden*, 25 Kan. 588, where Soden, having acquired the right to do so, built a dam, formed a pond to use in the operation of his mill, and the city bought property adjoining the pond and put down a well, from which it undertook to take the underground waters from the pond, it was held:

"While the general doctrine in respect to underground water percolating through the soil is, unquestionably, that the owner of the land may appropriate it to any use, and in any amount, and without reference to the effect of such appropriation upon his neighbor's land or supply of water, yet it is limited to this extent, that he may not thus indirectly destroy or diminish the flow of a natural surface stream to the injury of a riparian owner thereof." (Syl. ¶ 3.)

On a motion for rehearing (26 Kan. 492) it was held that if the city desired to take the water from Soden's dam either through a

pipe directly into it or through the percolating waters at the bottom of its well it would have to acquire the right to do so by condemnation proceedings.

In *Wood v. Fowler*, 26 Kan. 682 (1882) it was held:

"A riparian owner owns only to the bank and not to the center of a navigable stream,"

and that "the title to the bed of the stream is in the state." (p. 689.) These conclusions followed the common law. (See pp. 689, 690.)

Pertinent common-law rules respecting water and the right to its use are stated and applied in *A. T. & S. F. Rld. Co. v. Long*, 46 Kan. 701, 27 Pac. 182 (1891); *Mo. Pac. Rly. Co. v. Keyes*, 55 Kan. 205, 40 Pac. 275 (1895), and *Parker v. City of Atchison*, 57 Kan. 29, 48 Pac. 631 (1897). In *Campbell v. Grimes*, 62 Kan. 503, 64 Pac. 62 (1901), it was held a lower riparian proprietor may enjoin an upper one from diverting waters from the stream which he did not apply to some beneficial use, and this right was based upon the common law. In *Irrigation Co. v. Klein*, 63 Kan. 484, 65 Pac. 684 (1901), the court held the use of water for irrigation is a public use in this state for which the legislature may authorize a private person or corporation to exercise the power of eminent domain; and further held the legislature had authorized such condemnation proceedings in at least a part of the state by chapter 133 of the Laws of 1891, and apparently in all the state by chapters 95 and 151 of the Laws of 1899. In *Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571 (1905), after an extensive review of our statutes and decisions, it was held:

"The use of the water of a running stream for irrigation, after its primary uses for quenching thirst and other domestic requirements have been subserved, is one of the common-law rights of a riparian proprietor." (Syl. ¶ 10.)

In that case the district court had "apportioned the water among the various claimants according to the law of prior appropriation in vogue in certain of the Rocky Mountain states, rejecting altogether the rules of the common law relating to riparian rights." The judgment was reversed, the court holding, however, among other things: "The doctrine of prior appropriation may exist in the same state with the common-law doctrine of riparian rights," if there is statutory authority therefor.

In *Gilmore v. Salt Co.*, 84 Kan. 729, 115 Pac. 541 (1911), it was held that one has no right to accumulate upon his own land refuse matter of any sort by which the water underlying the land of a neighbor, and feeding springs thereon, is so affected through percola-

tion as to be unfit for its ordinary use, citing *City of Emporia v. Soden,* supra, and other authorities.

In *State, ex rel., v. Akers,* 92 Kan. 169, 140 Pac. 637 (1914), affirmed in *Wear v. Kansas,* 245 U. S. 154, the validity of chapter 259 of the Laws of 1913, was involved. This authorized the state to make a charge for the taking of sand from the bed of the Kansas river for commercial purposes. The court held the river to be a navigable stream and the bed of the river to be the property of the state, and sustained the statute. In a lengthy opinion, reviewing many authorities, the common-law doctrine pertaining to the matter was announced and approved and our earlier cases cited and followed.

In *Feldhut v. Brummitt,* 96 Kan. 127, 150 Pac. 549 (1915), the court was asked to adopt the doctrine of the western states with respect to irrigation. The court declined to do so, saying:

"In eastern Kansas the Idaho or arid states' doctrine would be entirely inappropriate; in central Kansas it would be of doubtful propriety; in the extreme parts of western Kansas it might do very well; but no court has power to divide this state, like all Gaul, into three parts, and impose a peculiar doctrine upon our western frontier." (Citing *Clark v. Allaman,* 71 Kan. 206, 80 Pac. 571.) (p. 129.)

In *Wallace v. City of Winfield,* 96 Kan. 35, 149 Pac. 693 (1915), it was held a city which had become a riparian owner of the water of a stream had no special or additional rights to such water as against a lower proprietor or one who had acquired prospective rights to the unobstructed flowage of the stream, and that the city by purchasing land abutting on the stream acquired the rights of a riparian owner, "which is the reasonable use of water for domestic and other ordinary purposes incident to the land, but it does not thereby acquire the right to divert or take water from the stream for the purpose of selling it to the inhabitants of the city without making compensation to those who are thereby deprived of water rights." (Citing *City of Emporia v. Soden,* supra, and other cases; and see the companion case of *Wallace v. City of Winfield,* 98 Kan. 651, 159 Pac. 11 [1916], in which the right of the city to condemn was sustained, following *Irrigation Co. v. Klein,* supra, and *Clark v. Allaman,* supra.)

In *Piazzek v. Drainage District,* 119 Kan. 119, 237 Pac. 1059 (1925), the difference between a navigable stream and one that is non-navigable is discussed, and it was held that the title to the bed of nonnavigable streams is in the riparian owners and not in the

state, and that a patent from the government conveying land through which a nonnavigable stream flows conveys to the patentee the bed of the stream, following the common-law doctrine and our earlier cases.

In *Durkee v. Bourbon County Comm'rs,* 142 Kan. 690, 51 P. 2d 984 (1935), this court applied the common-law doctrine of the right to the water in a running stream which had been diverted for road-building purposes, citing our earlier cases.

In *Frizell v. Bindley,* 144 Kan. 84, 58 P. 2d 95 (1935), the court held our statute (G. S. 1935, 42-101), which authorized the riparian owner to appropriate water for irrigation purposes, ineffectual to confer on him priority as against riparian owners under United States land patents which antedated the statute. The court quoted at length from *Shamleffer v. Peerless Mill Co.,* supra (p. 33), respecting the common-law rights of riparian owners, and said: "There has been no departure from this rule of law by this court." And in *Smith v. Miller,* 147 Kan. 40, 75 P. 2d 273 (1938), the court had occasion to say:

"Under the common law as frequently declared by this court, water in the natural channel of a running stream is an inseparable attribute of the land through which the stream flows. In legal parlance it is part and parcel of the land itself." (p. 42.)

In the recent case of *State of Colorado v. State of Kansas,* 320 U. S. 383, 64 S. Ct. 176, two paragraphs of the headnote read:

"Under the common law of Kansas, a riparian owner is entitled to reasonable use of waters of a stream for irrigation, but such use is subject to rights of other riparian owners to a like reasonable use.

"Under the common law of Kansas, what is a reasonable use of waters of a stream for irrigation by riparian proprietor must, in each instance, be determined in the light of total supply and total need of all riparian proprietors." (¶¶ 6, 7.)

While the above list of our authorities is not designed to be complete, it is sufficient to show, we think, that throughout the history of the state there has been no departure from the basic principle that water rights in this state are governed by the common law except as they may have been modified by statute. While the statements of facts are not very full in some respects, it would appear from the pleadings before us that in the use of the water in the Equus Beds the various cities here involved have acted under their rights in harmony with common-law principles and the decisions hereinbefore cited. That is to say, it appears that those desiring

water from the Equus Beds have contracted for the right to obtain it and have used it as an owner of the land might use it. No question of its drainage by one user from another appears yet to have arisen, but if so, no reason suggests itself why it cannot be handled under the principles of the decisions cited above applicable thereto.

..Under the above authorities underground waters are part of the real property in which they are situated. The owner of land may convey or grant the underground water, or the right to take it from the land, by an appropriate instrument in writing to the same extent that he might convey or grant any other portion of the real property; or a party, having the right of eminent domain, may appropriate underground water to his use by condemnation proceedings.

Defendants concede our decisions respecting water have followed the common law, but contend the position for which they argue here has not been considered by the court in its former cases. The point is not well taken, as an examination of the cases will disclose.

Defendants ask us to take judicial notice of the fact that:

"Both surface and underground waters are [to some extent] migratory and under natural laws of gravity seek their own lowest level."

Judicial notice may be taken of those facts as well as of the fact that by evaporation waters become elevated and mingle with the atmosphere. Defendants in their brief state:

"The corpus of the water in its natural state, and this includes water beneath the surface of the ground, is flowing, moving, circulating, oozing, filtering, percolating or falling from the physical confines of the realty owned by one person to realty owned by another."

As a general statement this may be conceded. They further assert:

"In this natural state the corpus of the water is not the exclusive property of any individual but is a public water resource."

This statement is too broad. An owner of land owns its surface and underground water by the same title as he owns the land itself, and the clay, gravel, coal or oil within it, even though these items of property differ in component parts. The land itself, or any of its parts, is a public resource in the sense that it may be taken for a public use, or the state may prohibit its waste or its use in a manner detrimental to others.

Defendants further advise us:

"Defendants do not recognize any private property right in unused water

or in unused sources of water supply and believe that only when an established right or appropriation authorizing a user to take and use from that source is diminished or extinguished to point of causing injury to his prior established appropriation can the user recover any substantial damage or maintain any action for injunctive relief."

This doctrine seems somewhat startling. All we care to say about it is that we think it contrary to the law of this state, repeatedly stated in our decisions hereinbefore discussed.

Our statutes pertaining to waters, their ownership, disposition and use have been builded about the common-law doctrines enumerated in the decisions above set out. Most of such statutes in force at the time were collected in G. S. 1935, chapter 24, pertaining to drainage and levees; chapter 42, pertaining to irrigation; chapter 59, pertaining to power plants and dams; chapters 74-506 to 74-510, pertaining to division of water resources, and chapter 82a, pertaining to water and watercourses. Changes made by the legislature in these statutes are noted in the G. S. 1943 Supplement. Some of these statutes took cognizance of the right to use water by appropriation, as chapter 115 of the Laws of 1886; G. S. 1935, 42-101 to 42-108, repealed in part by chapter 261 of the Laws of 1941; also chapter 133 of the Laws of 1891, G. S. 1935, 42-301 to 42-3,111, which related to the use of water for industrial purposes west of the 99th meridian; and chapter 210 of the Laws of 1911, relating to artesian wells, defined as those sunk to the artesian stratum or basin over 400 feet deep and the use of the water therefrom. Each of these statutes, however, recognized the common-law doctrine of the right of the landowner to the running waters or the underground waters on his land, and required others who desired to use such waters to obtain the right to do so by contract or by condemnation proceedings.

By chapter 172 of the Laws of 1917 the legislature created a commission to be known as the Kansas Water Commission and provided how its members should be chosen. By chapter 218 of the Laws of 1919 the legislature created a Division of Irrigation within the State Board of Agriculture, provided for the appointment of a commissioner, and designated where he should hold his office. In 1927, by chapter 293, the Kansas Water Commission and the Division of Irrigation were specifically abolished and there was created a Division of Water Resources within the State Board of Agriculture. All of the authority, power and duties then conferred or imposed by law upon the Kansas Water Commission and the State Irriga-

tion Commission were conferred upon the Division of Water Resources, and as amended by section 7 of chapter 271 of the Laws of 1933, the State Board of Agriculture was authorized to employ a chief engineer and such other expert assistants, clerical and other help as might be necessary properly to carry out the provisions of the statutes.

The duties transferred to the Division of Water Resources by chapter 293 of the Laws of 1927, from chapter 172 of the Laws of 1917, sections 4 to 8, inclusive, now G. S. 1935, 24-901 to 24-905, read as follows:

"As soon as practicable after organization the commission shall in conjunction with the federal government by way of securing financial and professional aid and assistance, work out a systematic general plan for the complete development of each watershed in the state in order to secure the most advantageous adjustment of the interest involved in matters of floods, drainage, irrigation, water power and navigation. Where any department of the federal government is now or hereafter may be engaged in the development of plans, affecting any of the subjects referred to in this act this commission may cooperate with such federal department. Water development of all kinds throughout the state shall conform to the general plans adopted by the commission.

"This commission is hereby authorized and directed to establish and maintain river gauging stations and to make such surveys and other investigations as may be necessary to a complete knowledge of the subjects herein assigned to it for investigation.

"The following principles shall guide the commission in its decisions and plans: (a) Surface or underground waters of the state may be appropriated by the federal government by civic decisions, by corporations, and by individuals upon application to the commission and in accordance with the rules and regulations it may prescribe. Such appropriation shall not constitute absolute ownership of such waters, but shall remain subject to the principle of beneficial use. (b) Where appropriations of water for different purposes conflict they shall take precedence in the following order, namely: domestic and transportation water supply, irrigation, industrial uses, water power. In each of these decisions prior application is to govern in making allotments. (c) Appropriation in excess of the reasonable needs of the appropriators not to be allowed. (d) Waters appropriated for irrigation are to become appurtenant to the lands to which they are applied, and underground waters for all purposes to become appurtenant to the lands under which they flow.

"The commission shall study the laws of the state relating to floods, drainage and irrigation with a view to making such revisions as may be necessary to accomplish the ends prescribed in this act, and they shall report the results of their investigation and make such recommendations as they may deem proper to the legislature from time to time.

"The commission and its agents shall have the power of entry on private lands for the purpose of carrying out the provisions of this act."

On behalf of defendants it is argued that the sections of the act of 1917 above set out have thrown off "the old common-law doctrine as voiced by the court in *Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571, not only as to underground waters but also as to streams and other surface water resources as well." We think the statute had no such effect. In the twenty-seven years since the statute was enacted the court has continued to recognize the common-law doctrine respecting water as set forth in *Clark v. Allaman*, supra, and earlier cases, and the legislature has continued to base statutes upon the common-law doctrine with respect to water rights even down to and including chapter 262 of the Laws of 1941. Defendants stress the last sentence in G. S. 1935, 24-901: "Water developments of all kinds throughout the state shall conform to the general plans adopted by the commission." We are not advised that any such general plans ever have been adopted. The same section of the act made it the duty of the commission to "work out a systematic general plan for the complete development of each watershed in the state in order to secure the most advantageous adjustment of the interest involved in matters of floods, drainage, irrigation, water power and navigation." We are not advised that this has ever been done. We are advised that the Commission of Water Resources and its chief engineer, in coöperation with the U. S. Geological Survey and the State Geological Survey, have made surveys and reports on ground water resources in Kansas for seven counties in the state and limited or partial reports for four other counties; that reports are in preparation for four more counties and some field work has been done in five other counties; so this work is far from complete. In the next paragraph the commission was authorized to establish and maintain river gauging stations. We understand that such stations have been established and maintained. The next section outlines certain principles which shall guide the commission in its work, and the next section makes it the duty of the commission to study the laws of the state relating to floods, drainage and irrigation with a view of making such revisions as may be necessary to accomplish the ends prescribed by the act and to make a report of such investigations and make such recommendations as it deems proper to the legislature from time to time. We are not advised that any such recommendations have ever been made to the legislature. Defendants stress some of the language in G. S. 1935, 24-903, and contend that this language gives the Division of Water Resources and its chief

engineer the authority to entertain applications for and conduct hearings and make appropriations of water among different users thereof. This section contains statements confusing, to say the least, and to some extent contradictory and difficult if not impossible to apply as a specific grant of authority for the commission to act. The meaning of the section is clear enough if it be regarded simply as a guide to the commission in doing the things it is specifically authorized and required to do by G. S. 1935, 24-901 and 24-904; and this is the interpretation we give to it.

The duties transferred to the Division of Water Resources by chapter 293 of the Laws of 1927, from chapter 218 of the Laws of 1919, section 4, now G. S. 1935, 74-509, read as follows:

"It shall be the duty of such irrigation commissioner: (1) To gather data, information and statistics from the existing irrigation plants in the state concerning the water supply and methods of securing the same and the methods employed in applying water to crops, and he shall tabulate and preserve in available form such information and shall publish and distribute the same from time to time; (2) to visit the site of any proposed irrigation plant in the state upon the request of any citizen of the state and advise as to the feasibility of installing such plant and furnish plans and specifications therefor upon request, such visits to be made only when his actual expenses therefor are guaranteed by the person requesting such visit; (3) to operate by lease under competitive bids all existing irrigation plants now owned by the state of Kansas, and installed by the Board of Irrigation, Survey, Experiment and Demonstration, or the state irrigation commissioner, until such time as he shall have determined the feasibility of irrigation under conditions existing at each of such plants, and all proceeds from the operation of any such plants shall be paid into and become a part of the funds herein provided, for the payment of the expenses of conducting such department; (4) to immediately take charge of all property of every kind and nature now belonging to the state of Kansas and heretofore purchased or otherwise acquired by the Board of Irrigation, Survey, Experiment and Demonstration, and the state irrigation commissioner and shall have authority to sell and dispose of any such property not including real estate and not necessary for carrying out the work of such department; (5) to make quarterly reports to the State Board of Agriculture, including itemized accounts of all receipts and expenditures of such department." (G. S. 1935, 74-509.)

There is nothing in that statute which authorizes the Division of Water Resources or its chief engineer to conduct the hearing and make the orders contemplated by the proceeding here involved.

In 1933 the legislature passed an act (Laws 1933, ch. 206) making it "the duty of the division of water resources of the state board of agriculture, under the direction of its chief engineer and other officers and employees, to distribute the water in any natural stream

among the several ditches or water users taking water from such stream, according to the rights of each as adjudicated by court decree." This and other sections of the statute are now G. S. 1935, 74-509b to 74-509e, inclusive. In each of the sections the duties imposed upon the Division of Water Resources and its chief engineer are simply to assist in carrying out decrees of the court. At no place in the statute is the Division of Water Resources or its chief engineer given authority to make any order of distribution of water among users thereof.

No statute cited to us, and none which we have found by our own research, authorizes the defendants, or any of them, to regulate, allocate or distribute, or otherwise interfere with the use and consumption of underground waters or to conduct a hearing upon the application of anyone desiring to use such waters, or for the allocation, distribution or regulation of the use of such waters.

The result is judgment should be for the plaintiff as prayed for in its petition. It is so ordered.