**UNITED STATES of America, Plaintiff,**

v.

**31.07 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF LEWIS AND CLARK, STATE OF MONTANA; Treasure State Industries, Incorporated, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**185.34 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF LEWIS AND CLARK, STATE OF MONTANA; Thomas H. Herrin, et al., Defendants.**

**Nos. 804, 806.**

United States District Court
D. Montana,
Helena Division.
Nov. 21, 1960.

1. Now 38 U.S.C.A. § 3102.

W. D. Rankin, Helena, Mont., for defendants involved in these Findings.

Krest Cyr, U. S. Atty., Butte, Mont., and John Blackwood, Asst. U. S. Atty., Billings, Mont., for plaintiff.

WILLIAM D. MURRAY, Chief Judge.

In the above entitled actions the United States condemned numerous parcels of land belonging to various different owners for use in connection with the Helena Valley Unit, Missouri River Basin Project, Montana. In each of the actions the just compensation due some of the various owners has been or will be arrived at either by agreement or trial. Involved in the present proceedings before the court is the question of just compensation due for the taking of the following parcels:

Cause No. 804:

    Parcel E–3, owned by Marguerite Greenfield

    Parcel E–7, owned by T. L. Greenfield, et ux.

    Parcels E–3 and E–7, leased by Joseph Chovanak

Cause No. 806:

    Parcels E–23 and D–16, owned by Myrlin G. Donaldson, et ux.

    Parcels E–24 and D–13, owned by Harry Helberg, et ux.

    Parcels E–33 and D–1, owned by Albert L. Olson, et ux.

Upon agreement of the above named owners, and the government, the issue of just compensation for the taking of these parcels was tried to the court without a jury, in a consolidated trial, and that is the only issue before the court.

The taking involved in each instance under consideration was an easement to construct, operate and maintain irrigation canals, laterals, ditches and other pertinent facilities, together with all the

rights and privileges incident to the use and enjoyment thereof.

*Cause No. 804—Parcels E–3 and E–7*

■ Parcel E–3, belonging to Marguerite Greenfield and parcel E–7, belonging to T. N. Greenfield and Doris N. Greenfield, his wife, were both leased to Joseph L. Chovanak at the time of taking, on March 20, 1959, under a lease that would run through the year 1964. Mr. Chovanak filed an appearance herein and testified at the trial. His testimony was the only testimony on behalf of the owners of Parcels E–3 and E–7, as to the damage caused to the owners by reason of the taking. In addition Mr. Chovanak also testified as to the damage of his leasehold by the taking and this testimony was objected to by the government upon the ground that damage to the leasehold was not compensable. The evidence was received under a reserved ruling and now, after an examination of the authorities, the court concludes that the government's objection is without merit, and that damage to the leasehold interest is compensable. In Silberman v. U. S., 1 Cir., 131 F.2d 715, at page 717, it was stated:

"The principle that the owner of an estate or interest in property condemned is entitled to compensation is not open to dispute. Nor is it doubted that a lessee for a term of years has an interest which must be recognized upon the taking of the property covered by his lease. (Citing cases)."

See also Duckett & Co. v. U. S., 266 U.S. 149, 45 S.Ct. 38, 69 L.Ed. 216; Kohl v. U. S., 91 U.S. 367, 23 L.Ed. 449; 29 C.J.S. Eminent Domain § 198, p. 1103; 18 Am.Jur. 865, "Eminent Domain", Sec. 232.

■ Of course, the combined awards to the owner and the lessee may not exceed the value of the land taken, plus damage to the remaining land caused by the taking; in other words, the difference between the value of the entire tract before the taking and the value of the remainder after the taking.

■■ Therefore, when land or a portion of land subject to a lease is taken by condemnation, the court must first determine the just compensation to be paid for the entire taking and then such compensation must be distributed between the owner of the property and the lessee as their interests may appear. Generally speaking, the market value of the leasehold is the measure of compensation for the taking of the leasehold. 1 Orgel on Valuation under Eminent Domain, 2nd Ed., Sec. 126.

In this case there was no evidence as to the market value of Mr. Chovanak's lease and the evidence is otherwise insufficient to establish the damage done to the leasehold of Mr. Chovanak or to apportion the damage done to that leasehold between the lands owned by the respective owners. Therefore, from the evidence before the court, the court can only decide the just compensation to be paid for the entire taking and either leave it to the Greenfields, as owners, and Chovanak, as lessee, to divide the compensation between them, or to take further evidence to decide that question.

*Parcel E–3, Marguerite Greenfield, owner; Joseph L. Chovanak, lessee*

■ This unit consists of approximately 366 acres of dry crop land and 206 acres of pasture land, or a total of 572 acres. The total acreage involved in the easement taken by the government is 9.24 acres upon which is constructed a lateral for the irrigation system. This 9.24 acres consists of dry crop land. As a result of the taking and the construction of the lateral, a tract of about 50 acres, lying east of the lateral, has been separated from the remainder of the unit and the operation of the entire tract as a unit has been somewhat impaired as a result of the severance of this 50 acres, which impairment would be reflected in the market value of the tract as a whole.

The court finds that on the date of taking, March 20, 1959, the fair market value for this type of dry crop land in the vicinity of the Helena Valley was $100 per acre, and the fair market value for this type of pasture land in that area was

$25 per acre. The court further finds that the fair market value of parcel E–3 in its entirety, immediately before the taking, was $41,750, and that immediately after the taking the fair market value of the remainder was $40,225, and the difference, or $1,525, represents the amount of just compensation for the taking of the easement across E–3, this amount to be divided between Marguerite Greenfield, as owner, and Joseph L. Chovanak, as lessee, as they may agree, or as the court may determine upon the taking of further evidence, if necessary.

In arriving at this finding as to just compensation, the court has considered the possibility of enhancement of value of the entire unit as a result of the construction of the government irrigation project, but from the evidence of one of the government experts, has concluded that because of the soil characteristics of the land, it would not be economically feasible to convert it to irrigated land and that even after the completion of the project the highest and best use of the unit will be as it was before—dry crop land and pasture.

*Parcel E–7, T. L. Greenfield and Doris N. Greenfield, owners; Joseph L. Chovanak, lessee.*

■ This parcel before the taking consisted of approximately 77 acres, 59 acres of which were dry crop land and the remaining 18 acres were pasture land. The tract is rectangular in shape, being roughly twice as long as wide with the 18 acres of pasture lying at the west end and the crop land being in a rectangular block east of the pasture land. The acreage within the easement taken is 6.59 acres, all of which is dry crop land. The lateral constructed on the easement runs diagonally through the dry crop land, leaving a triangular tract on each side of the lateral. Because of the relatively small size of this unit to begin with, and the triangular shape of the smaller tracts remaining after construction of the lateral, the operation of the entire parcel as a unit has been seriously affected and the market value of the unit as a whole has been substantially diminished by the taking. In this instance, too, the evidence shows that because of soil characteristics there will be no enhancement in the value of the unit by virtue of the construction of the irrigation project and the highest and best use of the land continues to be as dry crop land and pasture.

Again, the court finds that the fair market value of the types of land involved here on the date of taking was $100 per acre for the dry crop land and $25 per acre for the pasture land. The court further finds that the fair market value of parcel E–7, on March 20, 1959, immediately before the taking was $6,350, and the fair market value of the remainder immediately after the taking was $4,340. The difference of $2,010 is found to be the amount of just compensation for the taking of the easement across the land, said $2,010 to be divided between T. L. and Doris N. Greenfield, owners, and Joseph L. Chovanak, lessee, as they may agree, or if necessary, as the court may decide after the taking of further evidence.

*Cause No. 806—Parcels E–23 and D–16, Myrlin G. Donaldson et ux., owners; Parcels E–24 and D–13, Harry Helberg et ux., owners; Parcels E–33 and D–1, Albert L. Olson et ux., owners.*

■ These cases present a serious question of law as to whether damage done to the landowners' remaining lands by drainage of subsurface waters by drains constructed on the portion of the lands taken is compensable, or whether it is non-compensable "consequential damage".

A substantial portion of the land in each of the above ownerships, prior to the taking, consisted of sub-irrigated land, the highest and best use of which was for hay production and pasture in livestock operations. On the easements taken across the land of each of these owners, the government, as part of the irrigation system, has dug deep drain ditches, as well as laterals and mains. These deep drains have drained all of the subsurface water from the lands,

reducing the former sub-irrigated hay land and pasture to dry grazing land. While the lands are within the irrigation project, and water for irrigation will be available, at a price, to said lands, the evidence shows that because of the characteristics of the soil, the land will be no more valuable as irrigated land than it was as sub-irrigated land. Because of the soil, even as irrigated land, the highest and best use will still be as hay land and pasture with no substantially greater production than it had as sub-irrigated land. The evidence further shows that to subject these lands to irrigation from the project would require the expenditure of approximately $100 per acre to prepare the land, and that such preparation of the land would require three or four years, during which there would be no production at all on the land. In addition, after the land was irrigated, there would then be the charges for the irrigation water, and the labor and expense of applying the water to the land.

The government contends that all of these results flowing from the drainage of the subsurface water are "consequential damages" and not compensable. The landowners' position is that the damage is a direct result of the taking and the construction of the public improvement and that it is compensable.

█ No evidence was offered in the case as to whether the subsurface waters, which were drained by the government, were percolating waters, or waters in a subterranean stream with a defined channel. However, the general rule is that all underground waters are presumed to be percolating, and in order to take them out of the rule with respect to such waters, the existence and course of a permanent channel must be shown. 93 C.J.S. Waters § 87, p. 762. Likewise, the parties to this action apparently agree that the underground waters which were drained were percolating waters; at least no evidence to the contrary was offered.

█ It is one of the government's contentions that under Montana law the landowner's rights with respect to percolating water under his land do not constitute "property" within the meaning of the Fifth Amendment, and that, therefore, the draining of the water did not constitute a "taking" of the private property for which compensation must be paid. Montana follows the so-called common law rule with respect to percolating waters. In Ryan v. Quinlan et al., 45 Mont. 521, at pages 532 and 533, 124 P. 512, at page 515, the Montana Supreme Court quoted with approval the following statement from Chatfield v. Wilson, 28 Vt. 49:

"We think the practical uncertainties which must ever attend subterranean waters is reason enough why it should not be attempted to subject them to certain and fixed rules of law (such as apply to surface streams), and that *it is better to leave them to be enjoyed absolutely by the owner of the land as one of its natural advantages, and in the eyes of the law a part of it,* and we think we are warranted in this view by well-considered cases."

The Montana Court went on to say:

"The result of it is that the proprietor of the soil, where such water is found, *has the right to control and use it as he pleases for the purpose of improving his own land,* though his use or control may incidently injure an adjoining proprietor."

In Rock Creek Ditch, etc. Co. v. Miller, 93 Mont. 248, at page 260, 17 P.2d 1074, at page 1077, 89 A.L.R. 200, the court said:

"Conceding that *percolating waters are owned by and are subject to the control of the owner of the land* (Ryan v. Quinlan, supra; Spaulding v. Stone, 46 Mont. 483, 129 P. 327, 329), when they escape and go into other land, or come into another control, the title to the former owner thereto is gone."

See also Gas Products Co. v. Rankin, 63 Mont. 372, 207 P. 993, 24 A.L.R. 294, and

Stokes v. Tutvet, 134 Mont. 250, 328 P.2d 1096.

From the above quotations, it is clear that while percolating waters are not subject to absolute ownership in the strict sense, they are subject to a form of ownership which is recognized and may be protected. The status of percolating waters with regard to ownership is summed up precisely in 93 C.J.S. Waters § 90, p. 765, as follows:

"There can be no ownership in seeping and percolating waters in the absolute sense, because of their wandering and migratory character, unless and until they are reduced to the actual possession and control of the person claiming them. Their ownership consists in the right of the owner of the land to capture, control and possess them, to prevent their escape, if he can do so, from his land, and to prevent strangers from trespassing on his land in an effort to capture, control or possess them."

It follows naturally that if an owner of land has sufficient interest in the percolating waters in his land to prevent strangers from trespassing on his land in an effort to capture, control or possess them, that interest must also be sufficient to entitle the landowner to just compensation when, by virtue of the power of eminent domain, the "trespassing stranger" becomes legally entitled to enter upon the land and drain the percolating waters. The validity of this proposition was recognized by the Supreme Court of the State of Kansas, which state, like Montana, follows the common law doctrine with respect to percolating waters, in State ex rel. Peterson v. Kansas State Board of Agriculture, 158 Kan. 603, 149 P.2d 604, at page 608, where the court said:

"Under the above authorities underground waters are part of the real property in which they are situated. The owner of the land may convey or grant the underground water, or the right to take it from the land, by an appropriate instru-ment in writing to the same extent that he might convey or grant any other portion of the real property; *or a party, having the right of eminent domain, may appropriate underground water to his use by condemnation proceedings."*

It is immaterial that the government in this case does not actually appropriate the percolating waters to its own use, for it is the owner's loss, not the taker's gain, which is the measure of the value of the property taken. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311; United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206.

The above authorities lead to the conclusion that when percolating waters are taken or drained away as the result of the actual taking or partial taking of a landowner's land under the power of eminent domain, the landowner has suffered a property loss which is compensable under the Fifth Amendment. This conclusion was implicitly recognized in Gallerani v. United States, D.C., 41 F. Supp. 293, at page 294, cited and relied on by the government, when the court said:

"Mere injury to the land or the incidents of its possession, even though substantial, does not amount to a 'taking' for which compensation is required under the Fifth Amendment, *unless there is an actual invasion of the land* or some property right therein which, in substance, amounts to a complete appropriation."

It must be recognized in these cases, however, that it is not compensation for the taking of their percolating waters, as such, that the landowners seek, that is, they are not seeking the market value of the water. What they are seeking is compensation for the damage caused to their remaining land as a result of the taking of a part of their land and the construction by the government of a public work on that part taken. When

viewed from this aspect, their right to such compensation is even more clear under the authorities.

In Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270, the Supreme Court said:

"Consequently, when part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of compensation as damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition as to be itself of less value than before, the owner is entitled to additional damages on that account."

Again, in United States v. Grizzard, 219 U.S. 180, 184, 31 S.Ct. 162, 163, 55 L.Ed. 165, the Supreme Court said:

"The 'just compensation' thus guaranteed (by the Fifth Amendment) obviously requires that the recompense to the owner for the loss caused to him by the taking of a part of a parcel, or single tract of land, shall be measured by the loss resulting to him from the appropriation. If, as the court found below, the flooding and taking of a part of the plaintiff's farm has depreciated the usefulness and value of the remainder, the owner is not justly compensated by paying for only that actually appropriated, and leaving him uncompensated for the depreciation over benefits to that which remains."

A very enlightening discussion of this subject, too long to quote here, is found in United States v. Chicago, B. & Q. R. Co., 8 Cir., 82 F.2d 131, at pages 134 and 135, 106 A.L.R. 942. In that discussion Judge Faris points out that the early decisions of both state and federal courts awarded compensation only for land actually expropriated and nothing for damages accruing to other lands or parts of the parcels taken, but that the rule was obviously so unjust that it has become outmoded and discarded practically in all jurisdictions, and particularly in the courts of the United States at least since the case of United States v. Grizzard, supra, and probably before. The decision points out that the law is now in accord with the rule laid down in Lewis, Eminent Domain (3rd Ed.) Secs. 686 and 710, which is quoted at length in the opinion. A portion of the rule stated in Lewis, very germain to these cases, is as follows:

"When part of a tract is taken the damages are not limited to such as result from the mere severance of title caused by the taking, *but include damages caused by the use of the property for the purpose for which the condemnation is made (Citing cases). Such use embraces the construction of the work or improvement and the maintenance, use and operation of the same.*"

In these cases it is the use of the portion of the tracts taken for the construction of deep drains which results in the draining of the water from the remainder of the tracts and the resulting damage.

The government asserts that under Montana law an adjoining landowner could have drained the subsurface water from the lands in question, and argues that in a condemnation case the government does not assume a greater obligation to compensate for private property than the law imposes upon a private individual under similar circumstances, citing Gallerani v. United States, supra, and Campbell v. United States, 266 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328, and hence, the government should not be here held responsible for the damage caused by draining the subsurface water. This argument, however, is based upon a false premise. Under Montana law, as shown above, a landowner may drain his own land, and if in the process he incidently drains the water from his neighbor's land, he does not become liable for draining his neighbor's land. However, if he had to invade his neighbor's land in order to drain his neighbor's subsurface water, he would assuredly be liable for the damage caused thereby. Here the

government is not in the position of an adjoining landowner, but it has actually physically invaded and taken a portion of each landowners' land, and by that invasion and taking of a part, the government has damaged the remainder by draining the subsurface water. This question is dealt with in two sections of American Jurisprudence as follows:

"Any definite physical injury to land as an invasion cognizable to the senses, depreciating its market value, is a damage in the constitutional sense, *regardless of whether it is such an injury as a neighboring owner might inflict without liability at common law.*" 18 Am.Jur. 765–766, "Eminent Domain", Sec. 139.

Again in Sec. 265 of the same volume, at page 905, it is stated:

"The entire parcel is considered as a whole, and the inquiry is, how much has the particular public improvement decreased the fair market value of the property, taking into consideration the use for which the land was taken and all the reasonably probable effects of its devotion to that use. *It is immaterial that such damages might not be recoverable by mere adjacent owners, no part of whose land is taken.*"

It being clear that the landowners are entitled to compensation for the damages caused to their remaining lands by the construction of the public work on the portions of their land taken, the court will proceed to fix that compensation.

*Parcels E–23 and D–16, Myrlin G. Donaldson et ux., owners*

█ Before the taking, this ownership consisted of 655 acres, of which 320 acres was irrigated crop land and 335 acres was sub-irrigated land. The land included in the actual taking by the government consists of approximately 32 acres, of which 12 acres was irrigated crop land and 20 acres sub-irrigated land. The court finds that at the date of taking, the fair market value of the irrigated crop land of this ownership was $250 per acre and that the fair market

value of the sub-irrigated land on that date was $125 per acre. In addition to the land there were buildings on this land which are, of course, unaffected by the taking, of the value of $14,500. The court finds that the fair market value of the Donaldson ranch, as of April 21, 1959, immediately before the taking, was $136,375. As a result of the taking, 12 acres of irrigated crop land and approximately 20 acres of sub-irrigated land has been taken entirely, and as a result of the construction of the deep drains, the sub-irrigated land remaining to the owners has been reduced to dry grazing land.

The court finds that the fair market value as of April 21, 1959, for dry grazing land was $25 per acre. The court further finds that immediately after the taking, on April 21, 1959, the value of the Donaldson ranch was $99,375, and that the difference, between the value immediately before the taking and the value immediately after the taking, of $37,000 is the amount of just compensation to which Myrlin G. Donaldson and Kathryn E. Donaldson, his wife, are entitled.

*Parcels E–24 and D–13, Harry Helberg et ux., owners*

█ Before the taking, this ownership consisted of 620 acres of sub-irrigated land. 55.63 acres of this land were actually taken and occupied by the irrigation project. Buildings valued at $10,500 were situated upon the land. The court finds that the fair market value of the sub-irrigated land on this ranch, on the date of taking was $125 per acre. After the taking and the installation of the deep drains all that remained was dry grazing land, the fair market value of which the court finds was $25 per acre. The court further finds that on April 21, 1959, immediately prior to the taking, the fair market value of the Helberg ranch was $88,000, and that immediately after the taking the value was $24,610, and that the difference of $63,390 is the amount of just compensation to which Harry Helberg and Martha J. Helberg, his wife, are entitled.

*Parcels E–33 and D–1, Albert L. Olson et ux., owners*

 Prior to the taking, this ownership consisted of 288 acres, of which 115 acres was tilled crop land and 173 acres was sub-irrigated land. The court finds that the fair market value of the tilled crop land, at the time of the taking, was $200 per acre, and the fair market value of the sub-irrigated land was $125 per acre. Buildings of the reasonable value of $6,000 were situated on the land. Completely taken and occupied by the project works was approximately 16.76 acres of sub-irrigated land.

The court finds that on April 21, 1959, immediately prior to the taking, the fair market value of the Olson property was $50,625, and that immediately after the taking the fair market value was $32,-906, and that the difference of $17,719 represents the amount of just compensation to which Albert L. Olson and Corinne Olson, his wife, are entitled by virtue of the taking.

In each of the above instances the court has arrived at the amount of damage done to the respective land owners by awarding them the value of the land actually taken and occupied at the prices testified to by one or more of the government's experts, plus a reduction in value of $100 per acre for each acre of irrigated land that has been drained by the irrigation project. The value of sub-irrigated land of $125 per acre was likewise testified to by one or more of the government's experts and the value of dry grazing land of $25 per acre was likewise derived from testimony of one or more of the government's experts.

In addition, the amounts of damages awarded are likewise supported by the testimony of the defendants. As noted above, their testimony indicates that the sub-irrigated land involved on these ranches was of such character that it produced as much hay and pasture as sub-irrigated land, as it would produce as irrigated land and that even if the land is worked over in order to subject it to irrigation from the project, its highest and best use would still be for the production of hay and as pasture. The testimony further shows that in order to subject the former sub-irrigated land to irrigation, an expenditure of approximately $100 per acre would be required, and this would merely return the land, production-wise, to the same condition it was in before the taking.

Counsel for plaintiff is directed, pursuant to Rule 11(b) of the Rules of Court, to prepare a deficiency judgment in each of these actions in accordance with these Findings of Fact and Conclusions of Law and Opinion.