No. 37,631

The State of Kansas, ex rel. Fred Emery, County Attorney of Republic County (Frank G. Spurney, substituted), *Plaintiff*, v. George S. Knapp, Chief Engineer Division of Water Resources et al., *Defendants*.

(207 P. 2d 440)

Opinion filed June 11, 1949.

*Fred Emery,* of Belleville, argued the cause, and *Frank G. Spurney,* county attorney, was with him on the briefs for the plaintiff.

*Warden L. Noe,* special assistant attorney general, argued the cause, and *Harold R. Fatzer,* attorney general, was with him on the briefs for defendant George S. Knapp.

*N. J. Ward,* of Belleville, argued the cause, and *Donald Magaw,* of Osborne, was with him on the briefs for the defendant district and directors.

The opinion of the court was delivered by

Harvey, C. J.: This proceeding is submitted to the court upon briefs and oral argument for the determination of certain legal questions upon facts stipulated by the parties as follows:

"It is stipulated as between the parties that, subject to the Court's approval, this action be decided upon certain questions of law presented by the pleadings. As all the questions presented by the pleadings are not so submitted, the parties agree that for the purpose of decision the pleadings be considered, as containing only facts that present the questions now to be stated.

"A statement of facts, which the parties agree shall be considered with the pleadings, is as follows:

"The action is in behalf of the state, in the character of quo warranto, against Kansas Bostwick Irrigation District No. 2 and it officers, and Geo. S. Knapp, as Chief Engineer of the Division of Water Resources of the Kansas State Board of Agriculture.

"A petition was filed with the defendant Knapp, in his official capacity, on July 18, 1948, under Sec. 42-701 G. S. Supp. 1947, seeking the organization, establishment and authority to incorporate the district, for the purposes, among others there recited, of coöperating with the United States as provided under the Federal Reclamation Laws and other acts of Congress relating to water conservation and flood control, in the construction of irrigation and drainage works, the purchase, extension, operation and maintenance of such works, the

irrigation of irrigable lands in the district, and the assumption of obligations on the part of such district as principal or guarantor of indebtedness to the United States on account of said works.

"The petition was signed by 265 qualified landowners, owning 33,735 acres of irrigable land in the district there proposed; there being, in all, 483 qualified owners, owning 49,554 acres of irrigable land therein.

"Accompanying the petition, there was also filed an application, under Sec. 82a-709 G. S. Supp. 1947, for a permit to appropriate waters from the Republican River for irrigation of the lands of the district.

"Following notice, a hearing was had before the chief engineer on September 21, 1948, at which were presented objections of some 60 owners of land in the district. By appropriate findings and orders, the chief engineer granted the petition, fixing the boundaries of the district as set forth in the petition and approved the application for diversion and appropriation from such river, of 130,000 acre feet of water per calendar year, for such purposes, at a rate not exceeding 827 cubic feet per second.

"No appeal was taken from the action of the chief engineer and transcript of the proceedings was filed with the Secretary of State on October 26, 1948. Articles of incorporation were issued and recorded, and thereafter the district elected its officers. It issued temporary warrants to provide funds for preliminary organization expense under 42-709 G. S. Supp. 1947.

"As is commonly known, the Republican River and its tributaries flow through a part of Colorado and Nebraska. Its main stem enters and recrosses the Nebraska-Kansas state line (the north line of Jewell County, Kansas) several times then crosses north central Kansas, a distance of some 135 miles, to its confluence with the Smoky Hill River, near Junction City, Kansas. There are many persons who have owned riparian lands below the district, for a number of years prior to 1945.

"The district lies along both banks of the Republican. It extends from the Kansas-Nebraska state line southward some 19 miles on the west side of the river, and about 12 miles on the east side. By far the greater part lies in Republic County. Its width varies; it extends up to about 10 miles west of the river, and has an average width, west of the river, of about 6.5 miles. Its width east of the river extends to a little over two miles and has an average width east of the river of about one and one-half miles.

"The proposed district contains some 87,850 acres, of which 49,554 acres, or about 57 percent thereof, are classed as irrigable by the Reclamation Bureau. Approximately 43 percent of the irrigable land is designated by the Bureau as Class 1, which requires little preparation for irrigation. About 49 percent thereof is designated as Class 2, which requires some preparation, because of its soil or topographic features and the remaining 7 percent is designated as Class 3, which for the same reasons requires considerable preparation, although still considered as economically feasible. Of the about 38,300 acres of non-irrigable land in the district, which constitutes about 43 percent of the area of the district, about 1,000 acres thereof lies in the bed of the Republican River and the remainder is scattered over the district in small parcels, as along the beds of creeks and draws, along ridges and other high areas, and just inside the outer boundary or perimeter of the district, which results from following

subdivisions of the original government surveys. The irrigation plan includes, however, later irrigation of much of that now classed as nonirrigable, by means not immediately available.

"The Republican River Compact, recently concluded as between Kansas, Nebraska and Colorado (Chap. 82a, Art. 5, G. S. Supp. 1947), reflects that the average annual flow of the Republican River at its lowest crossing of the Kansas-Nebraska State line, undepleted by man, is 478,900 acre feet of water. Remaining after deduction of the allocations to Nebraska and Colorado, for irrigation and other uses, is 190,300 acre feet, that is allocated to Kansas by the Compact. It is from this 190,300 acre feet of water allocated that the 130,000 acre feet is to be taken annually by the district. As hereinafter shown the planned diversion points are located so near the State line that any local surface drainage to the river, in Kansas, above the diversion, is so inconsequential that it may be now disregarded.

"The Government has constructed what is known as the Harlan dam across the Republican River, about 80 miles west of the district, in Nebraska, to impound water for flood control and other purposes, including irrigation. The plan is to divert water from the river by means of two diversion dams; one near Guide Rock, Nebraska, below the Harlan dam, to provide water by means of canals, for a part of the portion of the defendant district lying west of the river, and another district just across the state line, in Nebraska. A second diversion dam is planned in and near the north end of the defendant district, to be known as the Hardy dam, to divert water into canals serving that part of the district east of the river, and the remainder of the part west of the river. The federal government proposes to erect the dams, main canals and distribution works, if the district will contribute under a contract with the federal government over a period of years toward maintenance of the works, and to the extent it is able, toward the cost of the works, by means of special assessments and water charges collected in the district. The directors have not by resolution or otherwise, yet committed the district to the payment of any specific sum for the district's contribution toward construction of the works, and the engineer's estimate of cost stated in paragraph 11 of the petition are not binding on the district.

"The greater portion of the lands in the district, for which the district proposes to provide irrigation water from the river, consists of lands of persons whose property does not touch the river, and lie from a fraction of a mile to as much as nine miles from the river.

"The proposed diversion of water for irrigation by the district will result in substantially reducing and diminishing the annual flow of the river thus allocated to Kansas, below the diversion points, and thus infringe upon the rights of the owners of riparian lands lying in and downstream from the defendant district. As it is not possible to state the extent of injury, if any, to lower riparian lands, and each tract will present its own problem, as affected by subsurface waters, surface drainage below the diversion points, return flow of irrigation waters by surface and subterranean means, and other local considerations; the matter is here submitted upon the assumption that substantial injury will result. The defendants deny that any ultimate substantial injury to riparian owners will actually result, and hence such assumption, made for the

purposes of this decision only, shall not be taken as a general admission of such fact, by the defendants.

"Since the approval of application for appropriation by the defendant district three other similar approvals have been granted, for 98, 80 and 120 acre feet of water annually, respectively.

"Prior to the approval of the chief engineer of the application for appropriation of water by the defendant district there were four approvals entered for water appropriation from the river by individual owners of riparian lands; two granted in 1943, without specifying the amount, one was granted in 1947 for 100 acre feet of water annually, and one in 1948 for 226 acre feet annually. All were for irrigation, and by owners of land downstream from the defendant district.

"The chief engineer has not completed gathering data, or made any orders pursuant to Sec. 82a-704 G. S. Supp. 1947, nor have any orders been entered by him under Sec. 82a-708 and 82a-715 fixing the amount of water or priority of right with respect to the two applications made in 1943.

"The federal government, through its appropriate agencies, has declined to proceed with the erection of diversion dams, canals and distribution works unless and until it is judicially determined that the district has been lawfully incorporated, and that it may lawfully divert, appropriate and so use the water covered by approval of its application for appropriation as granted by the chief engineer. Hence this action.

"QUESTIONS SUBMITTED FOR DETERMINATION

"1. Are Sections 82a-701 to 82a-720 G. S. Supp. 1947 unconstitutional as a taking of pre-existing vested riparian rights of downstream owners?

"2. Are Sections 82a-701 to 82a-720 G. S. Supp. 1947 unconstitutional as providing for the diversion and delivery, upon payment of water charges, of water from the river to irrigate lands that are not riparian in character, i. e., lands that do not touch the river and are owned by persons whose land holdings are all at least several miles from the river, as against and without any acquisition of the rights of lower riparian owners?

"3. Are Sections 82a-701 to 82a-720 G. S. Supp. 1947 unconstitutional as requiring an owner of riparian lands to affirmatively apply to and obtain the approval of the chief engineer for the use of river water in order to preserve such rights; or in case of use on or within three years prior to June 28, 1945, to appeal from an order of the chief engineer, made without hearing and without notice except subsequent mailing thereof?

"4. Are Sections 82a-701 to 82a-720 G. S. Supp. 1947 unconstitutional as improperly conferring legislative or judicial powers upon the chief engineer of water resources?

"5. Are Sections 42-701 to 42-704 G. S. Supp. 1947 unconstitutional as improperly conferring legislative or judicial powers upon the chief engineer of water resources?

"6. Does the inclusion of non-irrigable lands in the district to the extent of approximately 43% of the total area thereof amount to arbitrary action and abuse of discretion on the part of the chief engineer, so as to be in contravention of constitutional provisions?

"7. Are the provisions of Section 42-709 G. S. Supp. 1947 unconstitutional as providing an improper taxation of all taxable property in the district?"

In view of the above stipulation it is not necessary to analyze the pleadings filed herein by the respective parties, but the same are hereby referred to for their specific allegations.

Before taking up the specific questions submitted for determination by the stipulation we must take note of the fact that the defendant, Kansas Bostwick Irrigation District No. 2, is but a small part of the large project of the federal government authorized by the Act of Congress of December 22, 1944 (58 Stat. 887), pursuant to which the United States is constructing the Missouri River Basin Project as set forth in House Document 475 and Senate Document 191, as revised and coördinated by Senate Document 247, all of the 78th Congress, second session. (See 43 U. S. C. A. § 371 *et seq.*, including the above and related Acts of Congress.) Broadly speaking, and as far as here pertinent, the federal government by these acts has undertaken to put the waters of the Missouri river and its tributaries to beneficial uses by constructing dams and levees which would improve the uniform flow of water for navigation, prevent the disastrous effects of floods, provide low cost electric energy, furnish water for irrigation and for security against drouth, aid municipal water supplies, and furnish places for recreation and for the conservation of wild life. The area of the project is the entire valley of the Missouri river and its tributaries and includes the part of the state of Kansas north of the southern drainage area into the Kansas river and its tributaries, all of the states of Nebraska, North and South Dakota, the parts of Montana and Wyoming east of the Continental Divide, and northeastern Colorado, the drainage of which is to the tributaries of the Missouri river. That Congress had authority to enact such legislation is thoroughly attested and is not questioned here. Under U. S. Const., art. 6, ¶ 2, these acts of Congress become a part of "the supreme Law of the Land and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." In addition thereto the states of Colorado, Kansas and Nebraska, with the consent of Congress, have entered into what is known as the Republican river compact for the beneficial consumptive use of the waters of the Republican river. (See G. S. 1947 Supp. 82a-518, for its terms and the map showing its location.) Such a compact is binding upon the citizens of each state and on the judicial and the executive branches of the state government.

(See 59 C. J. 37 and authorities there cited.)   In June, 1944, this court decided the case of *State, ex rel., v. Board of Agriculture,* 158 Kan. 603, 149 P. 2d 604, in which it was held:

"We have no statute which authorizes the Division of Water Resources of the State Board of Agriculture or its chief engineer to regulate, allocate or distribute, or otherwise interfere with the use and consumption of underground waters, or to conduct a hearing upon the application of anyone desiring to use such waters for the allocation, distribution or regulation thereof."

The opinion referred to many of our earlier cases pertaining to irrigation and the common-law rights of riparian owners and spoke of such rights being governed by the common law, except as they had been modified by statute.   In August, 1944, the governor appointed a committee which included George S. Knapp, chief engineer of the Division of Water Resources, one of the defendants herein, as chairman, the attorney general, and other able men who had given much study to the subject.   In December of that year the committee made its printed report to the governor.   This included a synopsis of our statutes and decisions pertaining to waters, irrigation, and the rights of riparian owners, and expressed the view that our laws should be adjusted to present needs, from which we quote in part:

"The Committee believes that conditions, and the needs of the people in Kansas, have changed so greatly since the early adoption of the common law as applied to water use, that the time has come to modify the common law to the extent necessary to set up a system of appropriation, based on priority of right, but without depriving the common-law owner of relief by proper compensation for limitations placed on unused common-law rights.

"It believes that unused water cannot wisely be held in perpetuity for a common-law owner who may never have use for it, without resulting in underdevelopment permitting the water to flow out of the state and on toward the ocean, as an economic waste and loss of a valuable natural resource.

"It believes two things are needed, (1) to establish the right of appropriation under the rule of priority of right, and (2) to establish adequate administrative control over the appropriation of water to prevent overdevelopment of any source of supply with resulting injury to established uses."

After further discussion the committee recommended the enactment of the statute.   Governor Schoeppel, in his message to the legislature of 1945, referred to this committee and stated that it "made a report and certain recommendations that I deem wise, expedient. and necessary for consideration by this session of the Legislature."   The result was the enactment of the proposed act recommended by the committee, which became chapter 390, Laws of 1945, now G. S. 1947 Supp., chapter 82a, article 7.

We think it not out of place to note that recently in *Cow Creek Valley Flood Prevention Ass'n v. City of Hutchinson,* 166 Kan. 78, 88, 200 P. 2d 299, we spoke of the very considerable progress of the law with reference to flood control. In that case and in *Board of County Comm'rs v. Robb,* 166 Kan. 122, 199 P. 2d 530, we approved the federal and state statutes for flood control of the Arkansas River, and in *Heise v. Schulz,* 167 Kan. 34, 41, 204 P. 2d 706, we took notice of the analysis of the two common-law theories of riparian rights. This made it clear that the law of riparian rights originated in this country and did not find its way into the English cases until 1851. We also take note of the fact that if the statutes here under consideration make any change in the common-law rights of riparian owners our statute (G. S. 1935, 77-109), effective since 1868 (Gen. Stat. 1868, ch. 119, § 3) authorizes the legislature to do so.

Chapter 390, Laws 1945, was entitled "An Act to conserve, protect, control and regulate the use, development, diversion and appropriation of water for beneficial and public purposes, and to prevent waste and unreasonable use of water, . . ." amending and repealing certain prior sections of our statute. Its pertinent provisions may be summarized or quoted as follows, using section numbers in the 1947 Supplement (ch. 82a, art. 7):

701 defines (*a*) "Person"; (*b*) "Chief Engineer"; (*c*) " 'Domestic uses' means the use of water for household purposes, the watering of livestock, poultry, farm and domestic animals and the irrigation of gardens and lawns"; (*d*) " 'Vested right' means the right to continue the use of water having actually been applied to any beneficial use at the time of the passage of this act or within three years prior thereto, to the extent of the existing beneficial use made thereof, and shall include the right to take and use water for beneficial purposes where a person is engaged in the construction of works for the actual application of water to a beneficial use at the time of the passage of this act, provided such works shall be completed and water is actually applied for such use within a reasonable time thereafter"; (*e*) defines "Appropriator," and (*f*) "Appropriation."

702. "All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein prescribed."

703. "Subject to vested rights, all waters within the state may be appro-

priated for beneficial use as herein provided. Nothing in this act contained shall impair the vested right of any person except for nonuse."

704. Authorizes and requires the chief engineer to collect data respecting the vested rights of all parties using water for beneficial purposes other than domestic, to make a record of the same in his office, and to make an order determining and establishing the rights of all persons making beneficial use of water, and to notify the water users thereof, which order may be appealed from to the district court.

705. "No person shall have the power or authority to acquire an appropriation right to water without first obtaining the approval of the chief engineer: *Provided, however,* That this section shall not apply to persons using water for domestic uses."

706. "The chief engineer is hereby authorized and empowered, and it is hereby made the duty of such officer, to control, conserve, regulate and allot the water resources of the state for the benefits and beneficial uses of all of its inhabitants in accordance with the rights of priority of appropriation."

707. "(a) Surface or ground waters of the state may be appropriated as herein provided. Such appropriation shall not constitute absolute ownership of such water, but shall remain subject to the principle of beneficial use. (b) Where appropriations of water for different purposes conflict they shall take precedence in the following order, namely: Domestic, municipal, irrigation, industrial, recreational and water power uses. (c) As between appropriators, the first in time is the first in right. The priority of the appropriation shall date from the time of the filing of the application therefor in the office of the chief engineer. (d) Appropriation in excess of the reasonable needs of the appropriators shall not be allowed."

708. "The chief engineer shall determine the priorities of right to the use of the waters of the state, as to all persons who have since May 5, 1941, and who shall hereafter make application for a permit or certificate to divert, appropriate and use water. An appeal may be taken from any decision or order of the chief engineer to the district court in the county of his official residence or in the county in which the point of diversion is located. All such appeals must be filed within thirty days after date of such decision or order."

709, 710 and 711 provide for applications for the beneficial use of water and the procedure for handling them by the chief engineer.

712 deals with the approval or disapproval of the application and provides for remedy by injunction in certain cases.

713 to 715 are procedural provisions.

716. "If any appropriation, or the construction and operation of authorized diversion works results in an injury to any common-law claimant, such person shall be entitled to due compensation in a suitable action at law against the appropriator for damages proved for any property taken. An appropriator who has acquired a valid right under the statute may prevent, by injunction, a subsequent diversion by a common-law claimant of private rights without being required to first condemn possible private rights. An appropriator shall have

right to injunction relief to protect his prior right of beneficial use as against use by an appropriator with a later priority of right."

717. "All appropriations of water must be for some beneficial purpose. The right of the appropriator and his successors to the use of water shall terminate when he ceases for three years or more, to use it for the beneficial purposes authorized in his permit or certificate."

718 outlines a forfeiture procedure with appeal to the district court.

719 to 722 need not be specially noted.

Shortly stated, G. S. 1947 Supp. 42-701 to 42-704 provide that the majority of the qualified owners of irrigable lands within a proposed irrigation district may petition and make application to the chief engineer of the division of water resources of the state board of agriculture for the organization, establishment and authority to incorporate an irrigation district under the provisions of the act; that such irrigation districts may form or coöperate with the United States under the federal reclamation laws, or any act of Congress which shall permit the performance by the United States of work in this state for the construction of irrigation works, including drainage works, or for the purchase, extension, operation or maintenance of construction works, or for the assumption as a principal or guarantor of indebtedness of the United States on account of district works. The procedure is outlined for the hearing of the petition by the chief engineer and his approval or disapproval thereof, and for an appeal from his decision to the district court of the county, where a further hearing may be had.

If the district is approved and the petitioners authorized to incorporate the same there are further provisions for the election of a board of directors and outlining their duties. In connection with that section, 42-709 authorizes the board to issue irrigation district warrants for the purpose of financing the preliminary work of the board and its engineers, attorneys, agents and employees and other necessary incidental expenses, and to agree that the ad valorem taxes first collected by the district shall be used in payment of such warrants, and authorizing the board annually to levy and collect a general tax not exceeding two mills on the dollar on all taxable property within the district for the purpose of paying the warrants and the improvements to be made.

We do not find it necessary to write a treatise on the law of waters. Neither do we find it necessary to recite and comment upon each of the many cases cited by counsel, though we have ex-

amined and considered them. We shall limit our decision, as nearly as possible, to the questions submitted for our decision.

We must start with the realization that all the improvements being made or contemplated for the beneficial use of the waters of the Republican river are authorized by acts of Congress and the Tri-State Compact, both of which are binding upon the state and all citizens or owners of property within the state. Hence, they are in no position to complain of the building of the Harlan dam to impound water for flood control and irrigation or other works done under such acts of Congress or by compact.

We next observe that no complaint is made of section 702, which declares: "All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein provided." This is the heart of the statute. The rest of it treats of details and procedure. It forms the basis for a different approach to the solution of questions concerning water rights than we have had in some of our opinions. Heretofore we have approached the questions largely on the basis of individual interest alone. Under this declaration and other provisions of the act we now approach them upon the basis of the interest of the people of the state without losing sight of the beneficial use the individual is making or has the right to make of the water. Unused or unusable rights predicated alone upon theory become of little if any importance. Broad statements found in some of our opinions, such as "Every man through whose land a stream of water runs is entitled to the flow of that stream without diminution or alteration" (*Shamleffer v. Peerless Mill Company*, 18 Kan. 24), must be disregarded or modified to harmonize with this declaration. The change is an appropriate one for the legislature to make. Individuals do not live alone in isolated areas where they, at their will, can assert all of their individual rights without regard to the effect upon others.

Considering the portions of the statute dealing with details and procedure we find nothing seriously wrong with them. We have difficulty in seeing that the owner of land in Kansas riparian to the Republican river has a vested interest in floodwaters of the river impounded in the Harlan dam, eighty miles or more from his property. If he thinks he has such rights, and they have been damaged by the impounding of the water in the dam and its use for irrigation in Nebraska and Kansas, the statute gives him a right

to bring a suit for such damages. The suggestion that he has such rights as must be acquired by eminent domain is untenable. The suggestion that such an owner may be damaged by the use of such water for irrigation upon lands several miles from the river cannot be sustained. If the state is to control and regulate the waters of the state other than for domestic use it must ascertain what other use is being made of the water by riparian owners, and the act is not invalid because it authorizes the chief engineer to ascertain what other use is being made of the property and to require the owner to furnish a statement of such use and to obtain the approval of the chief engineer thereto, with the right of the owner to appeal to the district court from the determination of the chief engineer. Neither of the provisions (G. S. 1947 Supp., ch. 82a, art. 7), nor those in G. S. 1947 Supp. 42-701 to 42-704, confer legislative power upon the chief engineer. In the formation of such an irrigation district the fact that it includes some nonirrigable land, or land which is not presently irrigable, is not a material defect. The provision that some nonirrigable land within the district may be taxed for preliminary expenses is not invalid.

The result is that all of the questions submitted to us for determination should be and they hereby are answered in the negative.