No. 38,549

Charles Mizer, R. J. Swearingen, Elmer E. Anderson and Howard Barber, *Appellees*, v. Kansas Bostwick Irrigation District No. 2, F. H. Garman, Ward Douglas, Albert Billings and Fred Swoyer, for Himself and Other Landowners similarly situated as Intervenors, *Appellants*.

(239 P. 2d 370)

158

Opinion filed December 8, 1951.

*Fred Swoyer*, of Belleville, argued the cause and *N. J. Ward*, of Belleville, was with him on the briefs for the appellants.

*David Prager*, of Topeka, argued the cause and *Edward Rooney* and *Jacob A. Dickinson*, both of Topeka, were with him on the briefs for the appellees.

*Paul W. Applegate*, of Wakeeney, and *Arno Windscheffel*, of Smith Center, as *amici curiae*.

The opinion of the court was delivered by

SMITH, J.: This is an action by taxpayers to enjoin the officers of an irrigation district and the district itself from proceeding pursuant to a contract with the federal government. Judgment was for the plaintiffs. Defendants have appealed.

The petition alleged first the action was brought by four named plaintiffs and certain other persons similarly situated; that one defendant was an incorporated irrigation district and the three named defendants were the elected members of the board of directors of the district.

The petition then alleged that each of the plaintiffs were owners of irrigable land within the district and some of them were signers on the petition for the organization of the district, in accordance with G. S. 1947 Supp., 42-701, *et seq;* that they and many others were induced to sign the petition on representation that under the provisions of G. S. 1947 Supp., 42-701, before any assessment for improvement should be made against the lands of any person in the district the contract for such improvement should first be submitted to the electors of the district.

The petition then set out G. S. 1949, 42-721. This section provided, amongst other things, for the district entering into a contract with the United States for the construction of irrigation works and that such contract might provide for the payment of the cost of the levy and collection of assessments against the lands benefited. The section contained a proviso as follows:

"Provided no assessment shall be thus made against the lands of any person in district without said proposal or the contract providing therefor being first submitted to the electors of said district and approved by a majority of the electors of said district."

The petition then alleged that plaintiffs and the others in the district in reliance on the statute quoted above contracted with each other and with the state of Kansas in the organization of the district; that the statute was a part of the contract between the parties and the rights of the property owners in the district to vote on any proposal or contract providing for an assessment upon the lands in the district was a valuable vested property right, which was a part of the contract between the property owners and the state at the time the district was organized.

The petition then set out chapter 304 of the Session Laws of 1951. This section amended G. S. 1949, 42-721. This new section is exactly like the old 42-721 except for the proviso. That portion of the new section provides as follows:

"*Provided,* That before any assessments shall be extended on the tax roll against any lands in the district, or the contract providing therefor becomes effective, the board of directors in the district shall file an action in the district court in which the greater part of said district is located, for the approval of any such contract and for the approval of the proposed assessments. A copy of the proposed schedule of assessments shall be attached to the petition or embodied therein. Service of process shall be deemed sufficient upon the publication of notice in three issues, a week apart, in some newspaper of general circulation in the district. Said notice shall be addressed 'to the land owners of Irrigation District No. _____ in _____ County, Kansas:' (the number of the district and the name of the county to be filled in) and said notice shall state that a description of the various tracts of land in the district and their respective amounts of assessments proposed for each tract, as fixed by the board, may be examined in the office of the clerk of said district court. It shall not be necessary that the notice contain the description of the various tracts of real estate, or of the total real estate, within the boundaries of the district. Such notice shall specify a date not earlier than thirty days after the date of the first publication of said notice and not later than forty days thereafter within which any qualified owner of land within the district shall file his answer, or other pleadings, to said petition challenging the assessment against his property, if he believes a proposed assessment against his property is either: too high; erroneously computed; or not uniformly assessed in proportion to other tracts within the district. Upon trial of said cause, the court shall hear the evidence concerning the correctness and uniformity of assessments and may modify the schedule of assessments in accordance with such evidence. The court hearing such evidence shall review the schedule of assessments as proposed by the board of directors and shall not disturb the findings and assessments of the board unless the proposed assessments

are manifestly disproportionate. The assessments as determined by the district court shall be final and a conclusive determination that all such proposed assessments have been made in proportion to the benefits conferred upon such properties by reason of the improvements to be constructed, and such assessments shall constitute a perpetual lien on the properties so assessed, until paid. The approval of the proposed contract by the trial court, together with any approved changes or modifications of the same, shall be final and binding upon the parties signatory to said contract. For the purpose of defraying the expenses of organizing the district and the maintenance, operation, management, repair and improvement of such irrigation works, including salaries of officers and employees, the board may collect water rentals or service charges, or may levy assessments therefor, or by a combination of methods."

The petition then alleged that defendant had entered into a contract with the United States and were about to carry it into effect and levy assessments on plaintiffs' land without affording plaintiffs and other landowners in the district a chance to vote on the contract providing for such an assessment; that they had filed an action in the district court of Republic county for the approval of this contract; that plaintiffs had been informed, and believed and therefore alleged the fact to be that a majority of the electors and landowners in the district were opposed to the contract and as a result of the enactment of the new act of 1951 and the acts of the defendants the rights of the landowners in the irrigation district to vote on the assessments had been transgressed, in violation of article 1, section 10, of the constitution of the United States, which prohibited any state from passing any law impairing the obligation of a contract and the defendants were threatening to carry out the provisions of the void statute, in violation of the vested rights of plaintiffs, and in violation of the due process clause of the constitution.

The petition then alleged that in order to legally organize the district it was necessary that a majority of the qualified owners of irrigable land within the district sign the petiton; that at the time the district was organized there were 604 persons listed as owners of property in the district and only 265 persons signed the petition, which was not a majority; that the organization of the district was ineffective since a condition precedent to the organization of the district was not complied with.

The petition then alleged that chapter 304, Laws of 1951, was unconstitutional because it vested uncontrollable discretion in the court to approve or disapprove any contract entered into by the board of directors in behalf of the district; that this was an improper

delegation of legislative power to a judicial body, in violation of the constitution.

The petition further stated that plaintiffs had no adequate remedy at law and the acts of defendants might result in the creation of a public burden or the levy of an illegal tax; that all the plaintiffs' owned property might be effected by such assessment and their tax burden would be thereby increased.

The petition then alleged that an injunction should be granted enjoining the defendants from proceeding further with the action in the district court of Republic county and from carrying out the provisions of the contract and from levying any assessment on the lands of plaintiffs until they and the other landowners in the district have an opportunity to vote on the proposal.

The petition further stated there was an actual controversy between plaintiffs and defendants and the court should make a declaratory judgment as to the validity of chapter 304 of the Laws of 1951.

The prayer was for an injunction and that chapter 304, Laws of 1951, be held to violate the constitution.

Defendants' demurrer to this petition was overruled. Then they answered. In this answer they admitted the organization of the district; that plaintiffs owned land in the district classified as irrigable and that the legislature of 1951 enacted chapter 304, which amended G. S. 1949, 42-721. The answer then admitted the district had entered into a contract with the United States and shortly thereafter had filed an action in the district court for confirmation of that contract, pursuant to that chapter; that the action was pending on a motion to dismiss because of the filing of the present suit; that the petition was sufficient for the confirmation of the contract and the proceeding should not be dismissed; that on a day stated a demurrer to the petition in this and in the action to confirm were both heard by the court and at the same time the motion to dismiss was heard; the court took both demurrers under advisement and the court directed all parties to have their answers on file; that on June 21, 1951, a hearing was had and the district offered its evidence on the action to confirm, which evidence supported the petition, and the contract should be confirmed. The answer then contained two paragraphs as follows:

"The defendants concede that there are a number of controversies as between the plaintiffs herein and these defendants, as follows: The plaintiffs contend that House Bill No. 150 confers legislative powers upon the district court, and that such law violates Article 1 of Section 10 of the Constitution of the United

States, in that the same impairs the contractual right to vote approval or disapproval of said contract, and which the plaintiffs allege the landowners within the district had under the said section 42-721 before the passage of House Bill No. 150; and the plaintiffs also contend that said House Bill No. 150 violates the due process clause of the 14th amendment of the Constitution of the United States; and that their right to vote upon the contract was a vested right, and which has been taken away by House Bill No. 150; and plaintiffs further contend that said House Bill No. 150 is null and void for the reasons stated.

"These defendants contend that said House Bill No. 150 is not unconstitutional, is not null and void, and does not violate the provisions of the constitution stated, and does not vest legislative powers in the district court, but vests certain judicial powers as set forth in said law."

The answer then contained eleven additional paragraphs setting out legal questions and contentions the parties desired to have adjudicated. We do not find it expedient or necessary to set these out at this point.

At this point Fred Swoyer on behalf of himself and as the representative of some 237 landowners in the district moved for an order permitting him to intervene in the action. He stated that all the persons whom he represented were the owners of real estate in the district and interested in the action. This motion was allowed and the intervenor adopted the allegations of the defendant.

The reply was a general denial.

A motion was filed to strike several of the allegations of the answers. This was overruled. The cause was finally submitted on a motion of defendants for judgment on the pleadings.

The trial court made some eighteen conclusions of law, not all of which will we find necessary to discuss. Two of them are as follows:

"Said Chapter 304, Laws of 1951, constitutes an unwarranted and unlawful delegation of non-judicial functions and powers to the Court, and as such is in violation of a provision of the constitution of Kansas.

"Said act further impairs the obligations of contract between the owners of irrigable lands and the district, in that under the law as it existed when the district was incorporated, they were granted the right and privilege to pass upon the contract as between said district and the Federal agency and this right was taken away by the provisions of this act."

The final judgment was as follows:

"It is therefore ordered, adjudged and decreed by the court that the foregoing conclusions of law and declaration of rights, orders and decisions upon the controversies herein are the conclusions of law and the declaration of rights, orders and decisions of this court in the above entitled action; and that the defendants and each of them are enjoined and restrained from proceeding further with the said action pending in this court entitled 'In Re: Kansas-

Bostwick Irrigation District No. 2, a corporation, No. 10,556'; and that these defendants and each of them are further enjoined and restrained from carrying out the provisions of the contract with the Secretary of Interior, dated the 20th day of April, 1951, a copy of which is attached to the answer of the defendants herein; and these defendants and each of them are further enjoined and restrained from levying any assessments against the lands of these plaintiffs and other landowners within the district to pay for the works contracted for in said contract; and that the defendants pay the cost of this action.

"But that these defendants are not enjoined and restrained from otherwise exercising their powers, duties and functions as provided by law."

It will be noted the trial court adopted the contention of the plaintiff (1) that the provision in the statute at the time the district was organized providing for submission of the contract with the United States, together with the provision for the securing of the signatures at the time the district was organized constituted a contract between the landowners in the district on one hand and the state on the other and the repeal of the provision of the statute providing for submission of the proposal to the electors of the district constituted impairment of a contract in violation of article 1, section 10, of the constitution of the United States; and (2) that the statute amending G. S. 1949, 42-721, conferred legislative powers on the district court. Once we have answered these two contentions, some of the others will not require consideration.

We shall first consider the argument of plaintiffs on Question No. 2. It is based on the clear allegation in their petition that the transaction between the landowners, who signed the petition to organize the district, and the state, which enacted the statute through its legislature, was a contract, which article I, section 10, of the constitution of the United States, prohibits the state from impairing. Stated in other words, they argue that the right which the statute provided at the time they signed the original petition to vote on proposed assessments was a vested right which the state could not impair by subsequent legislation. We find but little to distinguish the organization proceedings provided in this statute from those providing for the organization of other districts in the state. Our statute books are full of organization proceedings for school districts, drainage districts and other municipal corporations. This statute provides as to irrigation districts organized pursuant to it—

"It shall have all the rights, powers and responsibilities belonging to other public corporations created under and by virtue of the statutes of the State of Kansas." (G. S. 1949, 42-705.)

A distinction between this and most other districts is that appar-

ently because this corporation was entering a rather new field in Kansas there were additional safeguards thrown around its organization.

In the first place, a majority of the qualified owners of irrigable land within a proposed district must sign a petition directed to the chief engineer of the division of water resources of the state board of agriculture for the organization of the district. "Chief engineer" is a new designation for an old office, the powers of which have been broadened somewhat as the state became irrigation conscious. (See G. S. 1949, 42-701[a].)

This first section contains a sentence as follows:

"Irrigation districts may be formed in order to co-operate with the United States under the Federal Reclamation laws heretofore or hereafter enacted or under any act of congress which shall permit the performance by the United States of work in this state for the purpose of construction of irrigation works." (G. S. 1949, 42-701[a].)

The act provides the requisite number of owners shall be filed for the approval of the creation of the proposed district; that such application shall be accompanied by adequate maps, a general description of the land proposed to be in the district and a statement of the source of water supply of the district, the proposed name, a description of the territory proposed to be organized, the name of the owners of irrigable lands in the district, the source from which the lands in the proposed district are expected to be irrigated, the character of the works, water rights, canals, ditches and other property proposed to be constructed, a statement of the need and purpose of the district. (G. S. 1949, 42-701.)

The act then provides that the engineer shall have the power to grant or reject or withhold approval of the application or incorporate in and make a part of his approval such conditions, regulations and restrictions as may be deemed by him advisable or require the submission of additional data and information before he does approve it. (G. S. 1949, 42-702.)

The act then provides for publication of notice of hearing upon the application by the chief engineer.

The act then provides any person interested may file a protest against the approval of the application stating his reasons and that a signer of the petition shall not be permitted to withdraw his name as a signer except for fraud, undue influence or mutual mistake of fact and then only after the chief engineer shall have determined that there was such fraud, undue influence or mutual

mistake. It provides that these applications for permission to withdraw must be filed with the chief engineer within thirty days after the first application and that he may hear and determine that application for withdrawal of signatures in advance of hearing for approval upon petition for establishment and organization of the proposed irrigation district.

The act then provides that applicants and objectors shall have the right to appeal to the district court in the county in which the proposed place of diversion of water is situated for a review as to the reasonableness of the division of the chief engineer in granting, withholding, or rejecting approval of the application submitted. These appeals must be taken within thirty days from the date of the order of the chief engineer. (G. S. 1949, 42-703.)

The act then provides that upon determination of the chief engineer that the proposed project is "practical, feasible and economically sound" and applicant is entitled to a permit for the use of water he shall issue applicant a permit providing for the incorporation of the proposed district. Then and not until then may the application be presented to the secretary of state for the granting of articles of incorporation, and the district shall be eligible to incorporate as a quasi municipal corporation." (G. S. 1949, 42-704.)

The act then provides that upon incorporation the district shall have all the rights, powers and responsibilities belonging to other public corporations created in and by virtue of the statutes of the State of Kansas. (G. S. 1949, 42-705.)

The act then provides detailed regulations as to the manner in which the election of three members of the board of directors of the district shall be held. It provides that these directors shall be owners of land within the district and residents of the county in which the district or portion thereof is located and that they shall serve for three years. This election is under the direction of the chief engineer. (G. S. 1949, 42-706.)

The board is directed first to elect a president, secretary and treasurer and that they shall appoint an assessor of the district and other employees. (G. S. 1949, 42-707, 708.)

The act then provides for selling negotiable evidences of debt for the purpose of defraying the temporary and necessary financial or preliminary expenses. (G. S. 1949, 42-709.)

The act provides that as soon as practicable after the organization the board shall formulate a general plan for its proposed opera-

tion powers, as approved by the chief engineer, and it shall state what construction work it is proposed to do and the estimated cost of such construction and shall state whether funds to defray such purchase price of cost of construction shall be raised by issuing bonds or by levying assessments. It provides for carrying on surveys and examinations and that the board shall submit a copy of its maps, plans and estimates to the chief engineer for his approval and upon receiving the approval thereof the board shall determine the amount of money required to be raised. (G. S. 1949, 42-710.)

This section provides as follows:

"All such surveys, examinations, maps, plans and estimates shall be made under the direction of a competent irrigation engineer and certified by him."

The act then confers certain powers upon the board of directors, amongst them are

"The board of directors shall have full power to do any and all things required by the federal statutes now or hereafter enacted, and any and all rules and regulations thereunder in connection with any contract between the United States and the district for the construction, operation and maintenance of any and all necessary works for the storage and distribution of water therein for beneficial use."

And further:

"The board of directors shall have the power to borrow from the United States, its instrumentalities, departments or agencies, such sums of money as may be necessary for constructing, completing, finishing or operating their works, and to mortgage their corporate property and acquired water rights to secure the payment of any debt contracted by the corporation for the purposes aforesaid and such authority is declared to be an exception to chapter 319 (*), Laws of Kansas, 1933." (G. S. 1949, 42-711.)

The act then provides the district, after it has obtained the approval of the chief engineer of its plans, maps, applications, surveys and examinations and his approval of application for beneficial use of the water, shall have the power to issue bonds of the district for the purpose of purchasing or constructing irrigation works. (G. S. 1949, 42-712.)

The act then provides in a detailed manner for the conduct of the bond election. (G. S. 1949, 42-712.)

The act then contains sections 42-715 and 42-717 of G. S. 1949, which provides as follows:

"The assessor for the district shall as soon as practicable after the first Tuesday of March each year, examine each tract or subdivision of land in said irrigation district and determine the benefits which will accrue to each of such tracts or subdivisions by reason of the construction or acquisition of such works;

and the amount so apportioned or distributed to each of said tracts or subdivisions as finally equalized or confirmed by the district court, as the case may be, shall be and remain the basis for fixing the annual assessments levied against such tracts or subdivisions in carrying out the purpose of this act. Such assessor shall make or cause to be made, a list of such apportionment or distribution, which shall contain a complete description of each tract or subdivision of lands in said district with the amount and rate per acre for such apportionment or distribution of cost, and the name of the owner or owners thereof; or he may prepare a map of convenient scale showing each of said tracts or subdivisions of land with the rate of apportionment or distribution of costs fixed thereon: *Provided,* That where all lands on any map or section of map are assessed at the same rate, a general statement to that effect will be sufficient with acreage in each tract shown. Said list or map shall be made in duplicate and one copy shall be filed in the office of the chief engineer and one copy shall be filed in the office of the board of directors of said district, and shall be made available for public inspection. Any assessment of any property in the name of the wrong person shall in no way invalidate the assessment thereof.

"On or before the fifteenth day of May, each year, the assessor must complete his assessment roll and deliver it to the secretary of the board of directors. The board shall thereupon fix a time and place when the board will meet to equalize assessments. The secretary shall give notice of such meeting in some manner as providing for posting and publishing notice of election for approval of resolution directing issuance of bonds. (b) Upon the day specified in the notice the board of directors shall meet as a board of equalization for the purposes of equalizing such assessments and shall continue in session from day to day, so long as may be necessary, but not to exceed ten days, exclusive of Sundays. The board shall hear and determine such objections to the apportionment of benefits and assessments as may come before it; and the board shall make such changes in the apportionment of benefits and assessments as shall appear to be just and equitable. The secretary shall be present during the sessions of the equalization board, and he shall note the changes made in the apportionment of benefits and assessments returned by the assessor and, in the names of persons assessed; and within ten days after the close of the session he shall have the assessments and benefits as finally equalized by the board, extended into columns and added."

We have already set out section 42-721, G. S. 1949, so it will not again be set out here.

There is then a provision for the dissolution of the district upon petition of the majority of the members of the board of directors and the approval of the chief engineer, a provision that the sections and provisions of the act are severable and not matters of mutual, essential inducement and that if any part of the act is held unconstitutional for any reason it was the intention that the remaining sections and provisions be in full force and effect.

There are provisions for changing the boundaries of the district and some other provisions with which we are not now concerned.

The trial court here found that all steps leading to the incorporation of the district had been duly performed and could not be questioned in this action. No cross appeal was taken from this order and it has become final. Besides the point was settled by what we held and said in *State, ex rel., v. Knapp,* 167 Kan. 546, 207 P. 2d 440.

The proceedings are referred to here in detail for the purpose of demonstrating that in the early phases of the organization of the district the rights of landowners are meticulously safeguarded by the provisions of the statute and that the purpose of the act was that when a district was organized pursuant to it it should enter into contracts with the United States. Once we have reached this conclusion it is inescapable that the situation is governed in a large measure by applicable federal statutes. In *State ex rel., v. Knapp,* supra, in dealing with the same irrigation district we said:

"That Congress had authority to enact such legislation is thoroughly attested and is not questioned here. Under U. S. Const., art. 6, ¶ 2, these acts of Congress become a part of 'the supreme Law of the Land and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' In addition thereto the states of Colorado, Kansas and Nebraska, with the consent of Congress, have entered into what is known as the Republican river compact for the beneficial consumptive use of the waters of the Republican river."

Again—

"We must start with the realization that all the improvements being made or contemplated for the beneficial use of the waters of the Republican river are authorized by the acts of Congress and the Tri-State Compact, both of which are binding upon the state and all citizens or owners of property within the state. Hence, they are in no position to complain of the building of the Harlan dam to impound water for flood control and irrigation or other works done under such acts of Congress or by compact."

This district, like the other districts and municipalities in the state, is a creature of the legislature. It has all the power that the statutes gives it plus those generally conferred on quasi municipal and other corporations by operation of law. Once the corporation has gone through the organization stage the property owners who signed the original petition for its organization have no other or additional rights than those of the other property owners, residents and electors in the district. In *The State, ex rel., v. French,* 111 Kan. 820, 208 Pac. 664, in dealing with a school district problem, we said:

"Of course, county high-school districts and rural high-school districts, like many other municipalities, are purely creatures of the legislature; not only subject to its creative power but its power to modify or dissolve."

*School District v. Board of Education,* 110 Kan. 613, 204 Pac. 758, is a school-district consolidation case. This court upheld a statute which provided for consolidation and for the organization of certain districts. We stated the question to be:

"Third: The petition in each of the cases alleged that the plaintiff district at the annual meeting in April, 1921, made provision by a unanimous vote of the electors for sending the pupils of the district to other schools and for payment of the transportation and tuition for them, and made a levy of taxes to meet the expenses. It is contended that the act, if given a retroactive operation destroys the vested right of the district to exercise its corporate functions."

Then we said:

"The fact is there is no vested right in the existence of a municipal corporation. To put it another way, the existence of a municipal corporation is not a vested right. A school district is a mere quasi municipal corporation and municipal corporations generally 'are mere agencies of government, and, except as specially restrained by other constitutional restrictions, are within the continued exclusive control of the legislature. Counties and towns are, as to their corporate existence, completely within such control. They may be changed, altered, enlarged, diminished or extinguished by the mere act of the legislature'."

*Board of County Comm'rs v. Robb,* 166 Kan. 122, 199 P. 2d 530, was a case in which we considered the constitutionality of a statute providing for drainage districts. One question was whether the statute was unconstitutional because it enabled the district to interfere with the functions of certain other districts. We said:

"A short answer is that both drainage districts and townships are creatures of the legislature and neither has any rights in a case such as is before us that the legislature may not alter at its pleasure."

The rule as to irrigation districts is laid down in 30 Am. Jur. 653, sec. 77, as follows:

"Irrigation districts are agencies established under governmental authority to accomplish the purpose of irrigation by the united efforts of landowners. Statutes providing for the organization and government of such districts and regulating the mode of assessments upon the lands therein are enacted pursuant to the power of the state to act for the public welfare, and usually are sustained as constitutional by both state and Federal courts. Thus, such acts have in many instances been upheld as against the contentions that they improperly delegate legislative or judicial power, violate the right to due process of law, or permit the taking of property for private use."

See, also, *Roby v. Drainage District,* 77 Kan. 754, 95 Pac. 399.

The plaintiffs recognize the force of the foregoing rule as to the district itself. They contend, however, that the rule is different as

respects the rights of the individuals in the district. Plaintiffs argue that these individuals have acquired vested rights in the election which cannot be taken away. We cannot see this distinction. In the opinions we have examined the trouble arose on account of contentions on the part of people generally, electors or taxpayers in the district, or who were affected by what happened in the district. We find no case where members of the group which initiated the organization of the district have rights different from those of the other taxpayers, electors or residents therein. The rule is stated in 16 C. J. S. Constitutional Law, p. 664 as follows:

"A taxpayer has no vested right that no change shall be made in the taxing statutes. There can be, therefore no vested right in the continuance of any particular tax or method of taxation, or any vested right securing one against the imposition of new taxes or their levy on a new basis. In the course of special assessment proceedings for local improvements, a property owner may acquire certain vested rights, but until vested rights have been acquired, the legislature may adopt new methods of financing improvement projects.

"A taxation statute, which by its terms is made retroactive, is within the power of the legislature and is not void as disturbing vested rights."

*State, ex rel., v. North Wichita Drainage District,* 127 Kan. 207, 272 Pac. 177, is informative partly because of the legislative history of the statute involved. Article 7 of chapter 24 of the Revised Statutes of 1923 had provided for the organization of a drainage district under certain circumstances by application to the district court of the county in which the land sought to be drained was situated, and that the district court could if upon the hearing of such petition it deemed the petition to be sufficient appoint two commissioners to project, control and conduct the drainage. The statute then set out detailed provisions as to the conduct of the business to the district.

Chapter 163 of the Laws of 1925 provided that after the proceedings had reached the point under the above statute where the court had provided the boundaries of the district and authorized the commissioners to proceed with the final plans, the commissioner should apply to the board of county commissioners for the incorporation of a drainage district to be composed of the lands approved by the court to be benefited by the proposed drainage. The law then provided for a hearing and for the issuing of bonds and for the levying of assessments to pay for these bonds. The act was attacked in *State, ex rel., v. North Wichita Drainage District,* supra, on one ground—that it impaired vested rights of property owners because a new method of financing drainage projects started

under the old statute was adopted. We dealt with this argument in a summary manner and said:

"No right to benefit of the existing method of taxation had vested in any property owner when the statute was enacted, and no property owner has a vested right to the continuance of any particular method of taxation under which he has not been taxed."

This matter has been dealt with by many courts on the theory that the relationship between the state on the one hand and the signers of a petition creating a district on the other one was not a contract. One court said it is not "a matter of contract but a proceeding in invitum in the exercise of the state police power." (See *Northern Road Improv. Dist. v. Meyerman*, 169 Ark. 383, 275 S. W. 762.)

This court used similar language in an analogous case. (See *State, ex rel., v. Bone*, 120 Kan. 620, 244 Pac. 852.) There banks of the state had voluntarily joined a bank guaranty fund. At the time the fund was organized the statute provided member banks could quit the fund by taking certain steps and insuring certain liabilities. A subsequent statute amended the original one in regard to the liabilities. One bank argued that if the statute as amended be interpreted to increase its liabilities it would be in violation of article 1, section 10 of the constitution of the United States in that it would impair a contract. In dealing with this argument we said: "The statute is hardly contractual in its nature anyway. It was originally enacted and the successive changes from time to time have been made in it, under and by virtue of the police power of the state." This court then pointed out that those who entered on enterprises such as the bank guaranty fund did so with the knowledge that the entity they are creating was a creature of the state acting through its legislature and subject to change as the legislature might deem to the best interests of all concerred.

On suber reflection this must be the law. To hold otherwise would be to open the door to all sorts of confusion when some enterprise did not turn out as anticipated. No one would care to deal with a municipal corporation such as the many districts in the state. To safeguard against any bad results from such a situation, the legislature threw the many safeguards around the organization of the districts that have been heretofore noted in this opinion.

The business of irrigation is a new one in this state. It would not do to hold that the statute in force when the district was or-

ganized constituted such a contract between the state on one hand and the incorporators of the district and other landowners therein on the other that it could not be changed by subsequent legislation. The entire affair is a matter of the police power of the state and subject to the legislative will. This is the effect of the holding in *LaMesa L. G. & S. Valley Irrig. Dist. v. Halley* (1925), 197 Cal. 50, 239 Pac. 719, where the court held that a statute under which an irrigation district was organized did not constitute the basis of a contract between the state and individual property owners in the state, incapable of impairment by the provisions of a subsequent statute. (See *Everglades Drainage Dist. v. Florida Ranch & Dairy Corp.* (1935); C. C. A. 5th), 74 F. (2d) 914, also *Northern Road Improv. Dist. v. Meyerman* (1925), 169 Ark. 383, 275 S. W. 762; also *Collins v. Jaicks Co.* (1919), 279 Mo. 404, 214 S. W. 391; also *Houck v. Little River Drainage Dist.* (1912), 248 Mo. 373, 154 S. W. 739 (affirmed in [1915], 239 U. S. 254, 60 L. Ed. 266, 36 S. Ct. 58.)

We conclude that the enactment of chapter 304 of the Session Laws of 1951 did not impair a contract in violation of article 1, section 10 of the constitution of the United States.

We go now to a consideration of Holding No. 1 of the trial court that chapter 304 of the Laws of 1951 constituted an unlawful delegation of nonjudicial functions and powers to the court and as such was in violation of the constitution of the state of Kansas. At the outset, we shall again refer to the provisions of chapter 304 of the Session Laws of 1951.

In the first place, the proviso of chapter 304 enacted in lieu of the provisions of G. S. 1949, 42-721, provides for the filing by the board of directors of an action in the district court for the approval of any contract between the district and the United States and of the proposed assessments thereunder. It provides that a copy of the proposed schedule of assessments shall be attached to the petition or embodied therein.

The act then sets out how notice by publication shall be had. There is no dispute about that. It provides that within thirty days after the date of the first publication and not later than forty days thereafter any qualified owner of land within the district shall file his answer or other pleading challenging the assessment against his property. This in plain language means that the court shall take no action against any of the assessments unless some particular owner challenges the assessment by a pleading filed in the action.

A vigorous argument is made as to the next three provisions, that is, the assessments may be challenged if they are too high, erroneously computed or not uniformly assessed in proportion to other tracts in the district. This provision, however, must be construed in connection with the following language, which provides that the court shall hear evidence concerning the correctness and uniformity of the assessments and may modify the schedule of assessments in accordance with such evidence. The entire power of the court, however, is limited by the provision as follows:

"The court hearing such evidence shall review the schedule of assessments, as proposed by the board of directors and shall not disturb the findings and assessments of the board unless the proposed assessments are manifestly disproportionate."

Regardless of the language in the early part of the act, where it speaks of assessments being too high, erroneously computed or not uniformly assessed in proportion to other tracts, and the court being given power to modify the schedule of assessments, the court's power is limited by the quoted language. It can only modify the schedule of assessments where some particular assessment is found to be "manifestly disproportionate" and that manifest disproportionment must be challenged by a pleading filed in the action within the time provided.

The provisions of the state's statute providing for the organization of drainage districts have been already set out in this opinion. The matter of the organization of the drainage district was before this court in *State, ex rel., v. Knapp,* supra. In that opinion we pointed out that this project is all a part of a general plan of congress authorized by the acts of congress.

As already quoted in this opinion, we said there:

"Before taking up the specific questions submitted for determination by the stipulation we must take note of the fact that the defendant, Kansas Bostwick Irrigation District No. 2, is but a small part of the large project of the federal government authorized by the Act of Congress of December 22, 1944 (58 Stat. 887), pursuant to which the United States is constructing the Missouri River Basin Project as set forth in House Document 475 and Senate Document 191, as revised and co-ordinated by Senate Document 247, all of the 78th Congress, second session. (See 43 U. S. C. A. § 371 et seq., including the above and related Acts of Congress.)"

We further said:

"That Congress had authority to enact such legislation is thoroughly attested and is not questioned here. Under U. S. Const., art. 6, ¶ 2, these acts of Congress become a part of 'the supreme Law of the Land and the Judges in every

State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' In addition thereto the states of Colorado, Kansas and Nebraska, with the consent of Congress, have entered into what is known as the Republican river compact for the beneficial consumptive use of the waters of the Republican river."

G. S. 1949, 42-711, provides amongst other things, as already quoted herein, that the board of directors shall have full power to do any and all things required by federal statutes and rules and regulations thereunder for the construction, operation and maintenance of any necessary irrigation works. Chapter 304 of the Laws of 1951 in a provision, the validity of which is not questioned, provides that "any irrigation district may enter into an agreement with the United States or any department, bureau or agency thereof in pursuance of the federal laws governing such department, bureau or agency." All the pertinent federal statutes, the compact between Kansas, Nebraska and Colorado, the contract between the district and the United States, G. S. 1949, 42-701 to 42-730, and chapter 304 of the Laws of 1951, must be construed together. It is our duty to uphold legislation, rather than to defeat it, and if there is any reasonable way to construe legislation as constitutionally valid it should be so construed. Chapter 304 of the Laws of Kansas of 1951 when so construed limits the power of the district court. This power must also be construed in connection with the provisions of the pertinent federal statutes. One of these provisions is

"That no contract with an irrigation district under this and the two following sections shall be binding on the United States until the proceedings on the part of the district for the authorization of the execution of the contract with the United States shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid." (43 U. S. C. A. 345, § 511.)

The power is judicial, not legislative. Chapter 304 of the Session Laws of 1951 does not confer legislative power upon the district court of Republic county.

(See *City of Salina v. Thompson, Trustee of Mo. Pac. Rly Co.*, 169 Kan. 579, 220 P. 2d 147; also 44 C. J. 590.)

We pass now to a consideration of Conclusions of Law No. 4 of the trial court, that chapter 304 of the Session Laws of 1951 is invalid insofar as it purports to confer jurisdiction on the court to pass upon assessments as against the owners of irrigable land in the district because no standard or set of rules is provided by which

the court may determine such assessments and it takes from the board of directors of the district a vested right to determine such assessments and the needs of the district in respect thereto. We have already determined in this opinion the only power the court has with respect to assessments is to determine whether any particular assessment against some particular tract of land is manifestly disproportionate. The court has no jurisdiction nor power to modify the schedule of assessments generally or otherwise than above. The contract between the district on one hand and the United States on the other provides that the land shall be divided into three classes by the secretary of the interior and that the assessments shall be made by taking into account the number of acres of land and their productivity, taking into account soils, topography and other relevant conditions. This is all a matter of expert testimony and is no more difficult of ascertainment than many other matters with which the courts are confronted. The federal statutes provide for this classification and for a reclassification under certain circumstances. At any rate, it is of no concern to the trial court in this action other than for the light it throws on the question whether some particular assessment against some particular tract is manifestly disproportionate.

We conclude the act was not unconstitutional for the reason given in Conclusion No. 4.

We shall next consider Conclusion No. 7 of the trial court that chapter 304 of the Statutes of 1951 is invalid because as construed by the trial court the court must make binding assessments at the time the contract is approved and there is no standard of rules to be observed in passing thereon. The court is in error in holding that the statute requires that it must make a final finding upon the schedule of assessments. As already held, the court's sole power is to set aside any assessment that is manifestly disproportionate. G. S. 1949, 42-715, provides for a uniform assessment of all the lands in the district in March of each year. G. S. 1949, 42-717, provides for an equalization of these assessments in May of each year. The provision as to the finality of the court's order upon approving the contract as to the assessment must give way to these two provisions. Furthermore, the federal statutes and the provisions of the contract provide that the question of assessments must be re-examined every year.

The entire science of irrigation is such that the federal statutes require a reclassification of lands within a district upon request. (See 43 U. S. C. A., Sec. 485g [c].) This provision is embodied in the contract in Section 16, Part B. Section A of the same part provides for the cost of the construction of the district estimated assessed at $3,500,000, being apportioned amongst the land in the district and one-fortieth of that cost being paid annually for forty years. There is a reason for this reclassification and reassessment. Over the period of forty years the science of agriculture will change. What would be approved practice tending to greater productivity today might not be the case forty years from today. Land that was most productive under the present art of husbandry might fall into one of the lower classes in the progress of the years. It would not do to place the stamp of finality upon any schedule of assessments made under present day conditions. (See 43 Stat. 702, subsection D, *et seq.*)

The only question is how this will be apportioned amongst the various tracts in the district. The entire matter is left to reassessment every year. It is a matter of the internal affairs of the district and cannot be settled with finality at the trial upon the petition to confirm or approve the contract.

We now shall consider Conclusion No. 9 of the trial court. This is that the contract is so uncertain and indefinite in its terms and conditions as to not present any issue that could be passed upon or approved by the court. As we have heretofore held, the only matter with which the court need concern itself is whether there is any' tract of land, the assessment of which is manifestly disproportionate. We find no such uncertainty as to permit a striking down of this statute.

We next consider Finding No. 10 of the trial court. This is that there is direct conflict between the provisions of the federal statutes and the state statutes. We have demonstrated that the federal statutes, the state statutes, the contract between the district court and the United States and the Republican river compact must all be construed together.

It is the duty of all courts to so interpret, apply and construe a statute as to result in it being held valid, when such an end can be reasonably attained. All these acts provide a pattern for the organization of irrigation districts. The contract naturally had to

meet the requirements of the statutes, both state and federal. The only matters with which the trial court was concerned are (1) whether the proceedings on the part of the district for the authorization of the execution of the contract had been carried out in a valid manner. These proceedings are not attacked here and anyway were approved by our decision in *State, ex rel., v. Knapp*, supra, and (2) whether the assessment as to any particular tract of land was manifestly disproportionate, as we have held this is a judicial question and the only one about which the trial court in this action is concerned. We find no such conflict as will require the striking down of the statute.

We find it unnecessary to examine the other conclusions of the trial court. They are all settled by what we have already said.

The judgment of the trial court is reversed and it is directed to dissolve the injunction heretofore issued against the board of directors of the district restraining them from proceeding further with the action in the court entitled "In Re Kansas Bostwick Irrigation District No. 2, A Corporation, No. 10,556" and the court is directed to proceed with the determination of that action and to determine whether any assessment as to any particular tract of land, which assessment was challenged in a pleading filed by the owner of that particular tract in due time, was manifestly disproportionate, and if he finds no such assessment to be manifestly disproportionate, to approve and to confirm the contract.